UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Doshia Daniels Burton, et al., )
)
)
    Plaintiffs, )
) Civ. Action No. 1:05CV02214(JGP)
v. )
)
United States of America, )
)
    Defendant. )
)
)

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO DEFENDANT UNITED STATES'
MOTION FOR SUMMARY JUDGMENT UNDER FRCP 56**

**FACTUAL BACKGROUND**

On the afternoon of January 10, 2003 Samuel Burton, a retired coast guard captain, was playing basketball. He felt a pop and realized that he had been seriously injured. He sought medical treatment at the Walter Reed Army Medical Center ("WRAMC") Emergency Room ("ER").[1] The ER staff requested an orthopedic consultation, which was done by Captain Benjamin Potter, a 2nd year orthopedic resident.

At the time he was injured, Captain Burton was a sixty-two year-old male in good health, playing basketball, evidencing his overall good state of health. He was seen initially in the ER and, after having

---

[1] *See* Mr. Burton's medical records relating to his treatment at WRAMC for his torn Achilles tendon, numbered pages 9-13 and attached hereto as Exhibit 1.

discussions with Dr. Benjamin Potter, Captain Burton decided on non-surgical treatment of his ruptured Achilles tendon.

Dr. Potter placed Captain Burton's foot in a soft splint and instructed Captain Burton to keep his foot up to minimize swelling. He was ordered to be non-weight bearing (*i.e.*, to use crutches and to not put any weight on his injured leg) and to return to WRAMC on January 15, 2003 to have a cast put on his leg.[2]

When Captain Burton returned to WRAMC on January 15, 2003, it was noted in the medical records that his leg had "moderately increased swelling," he was placed in a short leg cast ("SLC") (that started below his knee) for six (6) weeks. Dr. Potter again ordered him to remain non-weight bearing and also ordered that he elevate his leg to decrease the swelling. He was instructed to return to the Orthopedic Clinic in three (3) weeks.[3]

Captain Burton returned to the Orthopedic Clinic on February 7, 2003, where he was seen by Dr. Mase, who was a first year surgical intern. In his note, Dr. Mase indicated that he saw Captain Burton in the presence of Dr. Potter. However, Dr. Potter did not sign the note and made no entries in the chart of this particular visit.[4]

---

[2] Exhibit 1, p. 9.

[3] Exhibit 1, p. 11.

[4] Exhibit 1, p. 13.

At the time of the February 7, 2003 visit it was observed that Captain Burton, who was then approximately one month past the date of his injury, was still experiencing swelling in his foot, which increased at night. When the cast was removed, Dr. Mase indicated that Captain Burton had "2+ peri-ankle non-pitting edema."

During his recovery, Captain Burton observed the admonitions of Dr. Potter. Although he did go to church and walked on his crutches on occasion, he spent most of his time on a couch on the 1st floor of his home with his leg elevated. He, however, continued to experience swelling, especially at night, and was very eager to have the cast removed and replaced with a weight-bearing cast.

Despite Captain Burton's complaint of increased swelling in his foot as observed by Dr. Mase, no tests were performed to determine whether or not the swelling was associated with a thromboembolic event.[5] In this case, Captain Burton, as a result of various factors including, but not limited to, the immobilization of his leg in a cast, his injury, his increased age, his sex and other factors, was at high risk for developing deep vein thrombosis ("DVT").

Deep vein thrombosis is a condition in which a blood clot forms in a vein that is deep inside the body. It mainly affects the veins in the lower leg and thigh. A clot forms in the larger veins of the area

---

[5] A thromboembolic event occurs when a blood vessel is blocked by a thrombus (blood clot) that has broken away from its site of origin.

and can interfere with blood flow. More importantly the clot can break off and travel through the bloodstream (embolize). The traveling blood clot (embolus) can lodge in the brain, lungs, heart, or other area, severely damaging that organ.

In Captain Burton's case, the clot traveled to his pulmonary arteries. A copy of the Post Mortem Examination Report[6] is included within these pleadings and describes Captain Burton's cause of death as:

> I. Pulmonary Embolism Complicating Tendon Injury:
>
>   A. Left tendon injury (by history)
>   B. Status post cast placement and recuperation (by history)
>   C. Fresh thromboembolus in both pulmonary arteries extending to the distal arteriolar branches of both lungs
>   D. Thrombus of venous vessels of back of left leg.

DVT can occur as a result of a traumatic injury and/or decreased blood flow ("stasis") resulting from immobilization or surgery. Captain Burton had experienced trauma, which makes a person prone to produce blood clots in the deep veins of the calf. In addition, he had other risk factors, including his age (greater than 60 years) and his sex, which made him more prone to the development of DVT.

According to the American Heart Association, DVT affects up to two million Americans annually. Of the people whose DVT progresses

---

[6] A copy of the Post Mortem Examination Report is attached hereto as Exhibit 2.

to PE, up to 200,000 die each year – more than from breast cancer and AIDS combined.[7]

Moreover, and more relevant to the case at bar, is a 2002 national survey sponsored by the American Public Health Association ("APHA") and conducted by the APHA and the Centers for Disease Control and Prevention ("CDC"), entitled "Deep-Vein Thrombosis: Advancing Awareness to Protect Patient Lives – White Paper."[8] In the White Paper, admissible under Fed. R. Evid. 803(8), it states that most Americans (74%) were unaware of DVT. The White Paper also states that 74% of Americans are largely unaware of DVT and that 57% could not name any common risk factors or pre-existing conditions that could lead to DVT. Moreover, 95% of Americans have never discussed DVT with their physicians.

If there is a suspicion that a person has DVT, it is fairly easily diagnosed through the use of duplex ultrasound, a non-invasive procedure that is painless and takes approximately 20 minutes to conduct. No such procedure was suggested or performed on Captain Burton on February 7, 2003, when he was sent home with instructions to return February 25, 2003. On the evening of February 20, 2003 Captain Burton's son found him dead. The Maryland Medical Examiner

---

[7] Attached hereto as Exhibit 3 is a Statistical Fact Sheet from the American Heart Association regarding "Venous Thromboembolism & Pulmonary Embolism."

[8] Attached hereto as Exhibit 4 is the White Paper published by the American Public Health Association.

5

determined the cause of Captain Burton's death to be a pulmonary embolism.

During the intervening period between February 7, 2003 and February 20, 2003, the date on which Captain Burton died, he experienced chest pain and shortness of breath.[9]  The cardinal signs of pulmonary embolism are chest pain and shortness of breath. Additionally, persons who experience DVT or pulmonary embolism may experience a cough and pain in the mid-chest area.

Because Captain Burton had never suffered any illness which resulted in hospitalization or prolonged treatment, and had never been immobilized so as to require the use of crutches to ambulate, he attributed his shortness of breath to his de-conditioning as a result of his prolonged enforced period of inactivity.  He also experienced pain "inside his chest area,"[10] on or about the 9th of February, 2003, which lasted about three days and for which he took ibuprofen (Advil). Captain Burton and his wife attributed the pain to Captain Burton's having walked approximately 1300 feet quite a distance in deep snow

---

[9]  See letter dated March 5, 2003 from Doshia Daniels Burton to "Head of Orthopaedics" at Walter Reed Army Hospital, and Dr. Doukas' response, dated April 22, 2003, both of which are attached hereto as Exhibit 5.  See also Affidavit of Doshia Daniels Burton in Support of Plaintiff's Opposition to Defendant United States' Motion for Summary Judgment Under FRCP 56, attached hereto as Exhibit 6.

[10]  On page 12 of the Defendant's Memorandum in Support of its Motion for Summary Judgment, it asserts that the chest pain "seemed to emanate from the inside of his chest."  The actual quote from Exhibit B attached to Defendant's Memorandum is: "he experienced chest pain inside his chest area."

on both February 7th and 8th when he went to the mailbox and to his stranded car, and that he had over-exerted himself.[11]

The physicians at Walter Reed Medical Center, including the emergency room physician (Rangamani S. Murthy, M.D.)[12] and Dr. Potter (the orthopedic 2nd year resident), as well as the Chief of the Orthopedic Service, Colonel William Doukas,[13] had no appreciation of

---

[11]  See Affidavit of Doshia D. Burton, ¶ 16, attached hereto as Exhibit 6.

[12] In her deposition, Dr. Murthy stated the following concerning whether she advised Captain Burton of any risk of thromboembolism:

> Q.   To the best of your knowledge did you give Captain Burton any instructions concerning the danger of thromboembolism?
> A.   No, sir, I would not think of doing that.
> Q.   When you say you would not think of doing that why would you say that, Dr. Murthy?
> A.   To answer your question truthfully, I see a lot of patients with Achilles tendon rupture and I have never given the instructions of thromboembolism because these patients are – no, I have never done it.  And it is not in our scope of instructions.
> Q.   It is not in –
> A.   It is not in our scope to discharge patients, presuming they could have that as a complication, because it is not an accepted complication.
> Q.   When you treated him, this was your belief, that he was not at risk for thromboembolism.  Is that correct?
> A.   Correct

Deposition of Rangamani S. Murthy, M.D., p. 15, l. 2 – p. 16, l. 5, attached hereto as Exhibit 7.

[13]  Dr. Doukas, the Chief of Orthopedic Surgery at WRAMC, stated the following during his deposition:

> Q.   … First of all, if the person – this is for purpose of a hypothetical – if, in fact, a person had been immobilized in a splint for five days, and in addition to that the person had been bedridden, had been waited on head [sic] and foot for approximately five days, how would you characterize this person's risk of a thromboembolitic event such as a DVT?
> A.   Would that increase it or decrease it?  Is that what you are asking?
> Q.   My question is, if you can characterize it in these categories.  Would it be at low risk, moderate risk, high risk for a DVT?
>                                * * *
> A.   I think that is situational, depending on, again, comorbidities, whether or not this patient is a smoker, invalid.  There are many factors that

7

the true risk of pulmonary embolism that Captain Burton had as evidenced by their deposition testimony.

Although Dr. Potter claims that he informed Captain Burton of the signs and symptoms of DVT and pulmonary embolism, there is no evidence in the record that Dr. Potter ever fully advised Captain Burton. Dr. Potter has no specific, independent recall of advising Captain Burton of the risks associated with DVT/PE;[14] was unable to state whether Mrs. Burton was present at the time that he advised Captain Burton;[15] admits that he placed no entries into Captain Burton's medical record relating to the risks of DVT/PE, and admits that Captain Burton's medical records do not contain any written

---

        would come into play, as I would answer that question. But prolonged bedrest would put somebody at higher risk for DVT. That is correct?
Q.    Are you able to quantify such a person – again, assuming the facts as I have given them to you, hypothetically, do you have an estimate of what would be the probability of this person experiencing a deep vein thrombosis?
A.    Absolutely not.

Deposition of William Doukas, M.D., p. 20, l. 22 – p. 22, l. 11, attached hereto as Exhibit 8.

[14]  In his deposition, Dr. Potter testified as follows:

Q.    … As you sit here, today, do you have specific recall, not what you normally do, not what your custom, habit and routine practice was, but with respect to this patient, do you have specific recall what you told him [with respect to deep vein thrombosis/pulmonary embolism]?
A.    I would state that I always do it, as opposed to custom or habit, but, not, I do not have specific recall of that.

Deposition of Benjamin Potter, M.D., p. 26, l. 22 – p. 27, l. 7. A copy of Dr. Potter's deposition transcript is attached hereto as Exhibit 9.

[15] Dr. Potter testified that he did not have specific recall as to whether or not Mrs. Burton was present when he discussed these risks with Captain Burton. *See* Exhibit 9, p. 27, ll. 7-11.

8

instructions concerning the risks and/or the signs and symptoms of DVT and pulmonary embolism.[16]

Captain Burton's medical records indicate that Captain Burton was administered two powerful drugs while he was a patient in WRAMC's ER on January 10, 2003, Toradol, a non-steroidal inflammatory drug with a history of causing persons to have hallucinations and other serious side effects, and Percocet, a powerful narcotic.[17] Thus, even if Dr. Potter had given any oral warnings or instructions to Captain Burton while he was in pain or under the influence of the drugs he had been administered, a fact finder could find that Captain Burton did not understand such instructions.

Plaintiff's experts have testified that the standard of care required that a person receive warnings in writings concerning the dangers of DVT and pulmonary embolism as well as the signs and symptoms of DVT/PE. In Drs. Genecin's and Baker's expert reports,[18] they both state that the failure to inform Captain Burton of the signs and symptoms of DVT/pulmonary embolism was below the standard of care and a cause of his death.

Defendant now alleges that Captain Burton should have figured out on his own that he was at great risk of death, that Captain Burton

---

[16] See Exhibit 9, p. 48, l. 7 – p. 51, l. 4.

[17] See Exhibit 1, p. 10.

[18] See Exhibit 10 and Exhibit 11, which are respectively copies of Dr. Paul Genecin's and Dr. Margaret Baker's reports prepared pursuant to Fed. R. Civ. Pro. 26.

9

should have known the signs and symptoms of DVT and pulmonary embolism, that he should have known that shortness of breath and chest pain are serious, and that he should have called his doctor or gone to a hospital immediately, even in the absence of any warnings by his physicians.

## ISSUES PRESENTED

### ISSUE ONE:

Since Summary Judgment Is Appropriate Only If There Is No Dispute As To Any Material Fact And Defendant Is Entitled To Judgment As A Matter Of Law, Has Defendant U.S.A. Established That Captain Burton Was Contributorily Negligent As A Matter Of Law By Failing To Seek Treatment For The Signs And Symptoms Of Pulmonary Embolism He Experienced (Such As Shortness Of Breath And Chest Pain) In The Absence Of Knowledge Of What These Symptoms Meant?

### ISSUE TWO:

Under The Circumstances Of This Case, Has Defendant U.S.A. Established That There Is No Issue Of Fact For The Court To Decide?

## ARGUMENT

### ARGUMENT ONE:

Summary Judgment Is Appropriate Only If There Is No Dispute As To Any Material Fact And Defendant Is Entitled To Judgment As A Matter Of Law.  Defendant U.S.A. Has Not Established As A Matter Of Law That Captain Burton Was Contributorily Negligent By Failing To Seek Treatment For The Signs And Symptoms Of Pulmonary Embolism He Experienced (Such As Shortness Of Breath And Chest Pain) In The Absence Of Instructions From Defendant As To What These Symptoms Meant

District of Columbia courts have long followed the rule that:

> Whether a plaintiff is contributorily negligent is usually a question for the jury. "Only in exceptional cases will questions of negligence [and] contributory negligence … pass from the realm of fact to one of law. Unless the evidence is so clear and undisputed that fair-minded men can draw only one conclusion, the questions are factual and not legal."[19]

Similarly, in *Durphy v. Kaiser Foundation Health Plan of Mid-Atlantic States, Inc.*,[20] the D.C. Court of Appeals, in reversing a grant of summary judgment in favor of a defendant in a medical malpractice case, stated the following:

> … In the context of a medical negligence case, the physician's superior knowledge and expertise in the subject area and the generally limited knowledge of the patient concerning the dangers associated with the illness and treatment may negate the critical elements of the defense of contributory negligence, specifically the knowledge and appreciation of the risks and dangers associated with certain medical treatment. *Morrison v. MacNamara*, *407 A.2d 555, 567 & n.11 (D.C. 1979)*. Therefore, the physician generally owes to the patient a greater duty than the patient owes to himself or herself. *Id. at 568.*

An essential question common to the evaluation of contributory negligence claims is whether plaintiff had the knowledge and appreciation of the dangers associated with his condition sufficient to enable him or her to make informed decisions regarding what actions to take to protect themselves. If the defendant's own employees, Drs. Potter and Doukas, did not appreciate the fact that Captain Burton was

---

[19] *Paraskevaides v. Four Seasons Hotels*, 292 F.3d 886, 893 (D.C. 2002), *citing Shu v. Basinger*, 57 A.2d 295, 295-96 (D.C. 1948) (footnote omitted).

[20] 698 A.2d 459, 465 (1996)

11

at high risk for DVT/PE, it is implausible that Dr. Potter issued an effective warning to Captain Burton.

At his deposition, Dr. Potter testified that he "was familiar in general with the medical literature regarding deep venous thrombosis and orthopedic cases at that time" he rendered treatment to Captain Burton.[21] Additionally, the standard of care required that the hospital and the physicians caring for Captain Burton keep abreast of the medical literature. Had they kept abreast of the medical literature, they would have known that Captain Burton was at high risk for DVT/PE because of his age, sex, immobility in a cast,[22] and the swelling of his leg one (1) month after the injury. Had they kept abreast of the medical literature, Dr. Potter or WRAMC and its physicians would have known that DVT/PE were common after ruptured Achilles tendons.[23]

Since the physicians did not understand that Captain Burton was at high risk for DVT/PE, they could not have advised Captain Burton that he was at high risk for DVT/PE. This failure alone shows that Captain Burton did not have, nor should he have had, knowledge of the dangers he faced.

---

[21] See Exhibit 9, Dr. Potter's Depo., p. 17, ll. 11-13.

[22] See Table 2 – Levels of Thromboembolism Risk in Surgical Patients Without Prophylaxis, from Geerts, et al. Prevention of Venous thromboembolism, CHEST 2001; 119:132S-175S, attached hereto as Exhibit 12.

[23] See Micheli, "Thromboembolic Complications of Cast Immobilization for Injuries of the Lower Extremities," Clin Orthop Relat Res 108, 191– 195 (1975), particularly Patients 3, 4 and 6, attached hereto as Exhibit 13.

Since plaintiff controverts the material facts essential to a finding of contributory negligence, *i.e.*, Captain Burton knew, or should have known, that shortness of breath or mid-chest pain were sentinel signs of an impending pulmonary embolism which could be fatal, a finding as a matter of law that he was contributorily negligent would be clearly unwarranted.

**ARGUMENT TWO:**

<u>A Key Issue Presented For Determination By The Finder Of Fact Is Whether Dr. Potter Gave Adequate Oral Instructions To Captain Burton</u>

When moving for summary judgment based on the affirmative defense that plaintiff was contributorily negligent, the burden of proving contributory negligence is on the defendant and the existence of contributory negligent is normally a question of fact for trial.

In *Lynn v. District of Columbia*,[24] the District of Columbia Court of Appeals stated the following with respect to contributory negligence:

> The existence of negligence and contributory negligence are normally questions of fact for the jury, and it is only where the facts are undisputed and, considering every legitimate inference, only one conclusion may be drawn that a trial court may find negligence or contributory negligence as a matter of law.[25]

The Court went on to quote *Tilghman v. Johnson*,[26] as follows:

---

[24] 734 A.2d 168 (D.C. 1999).

[25] *Id., at 172..*

[26] 513 A.2d 1350, 1351 (D.C. 1986).

13

> Only in exceptional cases is evidence so clear and unambiguous that contributory negligence should be found as a matter of law.

This is clearly <u>not</u> an exceptional case warranting summary judgment.

Defendant urges that since Captain Burton had shortness of breath and chest pain, he should have known that his life was in danger and, therefore, he should have sought medical assistance "during and after his shortness of breath and chest pain …"[27] Defendant then analogizes plaintiff's conduct in the instant case to the conduct of the plaintiffs in *Parkins v. United States*[28] and *Hall v. Carter.*[29] For the reasons stated below, defendant's reliance on these cases in support of its claim for summary judgment is misplaced.

In *Parkins*, there was no finding of contributory negligence. The Court did not bar the widow's claim against the government for failure to give her husband informed consent and her derivative loss of consortium claim. The Court denied her claim for wrongful death because the Court in the FTCA case found that her husband's death four (4) years after he was rendered quadriplegic by the defendant's negligence was "… proximately caused" by a failure of proper hygiene

---

[27] Defendant's Memorandum, p. 12.

[28] 834 F. Supp. 569 (D. Conn. 1993).

[29] 825 A.2d 954 (D.C. 2003).

and that Mr. Parkins and his family failed to promptly seek medical attention for an infection. The Court found that "[t]he conduct of the doctors four years earlier" was not the proximate cause of Mr. Parkins' death.[30] There was no issue on appeal of contributory negligence. Defendant's reliance on *Parkins* for support of its assertion that a finding of contributory negligence as a matter of law is appropriate in this case is strained.

In *Hall v. Carter, supra*, a patient lied to her physician about how much she smoked. The defendant doctor told her that smoking inhibited wound healing.[31] She continued to smoke after the operation, which delayed healing. The jury found that the patient was contributorily negligent. The jury also found that the defendant doctor had the last clear chance to prevent the injury. The appellate court reversed the latter finding.

*Hall v. Carter* was not decided based on the presence or absence of contributory negligence. More importantly, *Hall* was decided by a jury and it in no way supports a finding of contributory negligence in this case as a matter of law as urged by the United States.

---

[30] 834 F. Supp. 574-575.

[31] 825 A.2d 954, 956.

In fact, in most of the cases cited by the defendant, the issue of contributory negligence was submitted to the jury with instructions.[32] All of these cases support the proposition that whether contributory negligence exists is ordinarily for a fact finder to determine. The cases cited by defendant support plaintiff's position that Captain Burton could be found to be contributorily negligent only if he had reason to know and appreciate the dangers and risks of DVT/PE or that a reasonable person would appreciate the dangers. Captain Burton had no medical training and no specialized knowledge of DVT/PE. In fact, as cited herein and in Exhibit 4 hereto, statistics show that most people know little about DVT/PE, much less their risk factors and their signs and symptoms.

There exists a factual issue as to whether Dr. Potter educated Captain Burton to the risk of DVT/PE, the significance of shortness of breath and chest pain, and the actions Captain Burton should take if these signs and symptoms appeared.

On the other hand, defendant has not made the requisite showing that there is no dispute as to any material fact and that the United States is entitled to judgment as a matter of law.

---

[32] *Chudson v. Ratra*, 548 A.2d 172 (Md. Ct. Spec. App. 1988) (The court held that the issue of plaintiff's contributory negligence was properly submitted to the jury. *Id. at 183)*; *Durphy v. Kaiser Foundation, supra* ("The issue of contributory negligence was properly submitted to the jury. …", 698 A.2d 459, at 467); *Fall v. White*, 449 N.E.2d 628 (Ind. Ct. App. 4th Dist. 1983) (In *Fall*, the plaintiff did "not complain of the language which instructs that a patient may be contributorily negligent. …" 449 N.E.2d 628, at 633); and *Scoggins v. Jude*, 419 A.2d 999 (D.C. 1980 ("The jury should have been allowed to consider whether [plaintiff] was contributorily negligent. …" 419 A.2d 999, at 1006).

## CONCLUSION

This case produces no new or unique features which would entitle defendant to a finding of contributory negligence as a matter of law. In viewing the evidence in a light favorable to plaintiff, there is no basis in law or fact for rendering summary judgment against plaintiff.

Respectfully submitted


_____/s/_____
ALLEN T. EATON
Federal Bar #10376/D.C. Bar #133991
1111 - 14th Street, N.W.
Suite 777
Washington, DC  20005
202-789-0088 / FAX 202-789-1377

Attorney for Plaintiff

Dated:  July 20, 2007