UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


DOSHIA DANIELS BURTON,  :

et al.,                 :

                        :

          Plaintiffs :

                        : Civil Action No.

    vs.                 :  05-2214 (JGP)

                        :

UNITED STATES OF AMERICA:

                        :

          Defendant  :


          Washington, D.C.

          September 29, 2006


Deposition of:


          BENJAMIN POTTER, M.D.,

called for oral examination by counsel for

Plaintiffs, pursuant to notice, at the Walter

Reed Army Medical Center, Building 2, Command

Suite, Washington, D.C., before Zev V. Feder,

CSR, a Notary Public in and for the District

of Columbia, beginning at 2:05 p.m., when were

present on behalf of the respective parties:

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

Page 2

On behalf of the Plaintiffs:

   BY:  ALLEN T. EATON, III, ESQ.
        THE EATON LAW FIRM, PLLC
        1111 14th Street, N.W., Suite 777
        Washington, D.C. 20005
        (202)789-0088

On behalf of the Defendant:

   BY:  STEVEN RANIERI, ESQ.
        Special Assistant U.S. Attorney
        District of Columbia
        555 4th Street, N.W., Room 44408
        Washington, D.C. 20530
        (202) 353-9895
           and
   BY:  CAPT. KELLY T. DAVISON, ESQ.
        U.S. Army Legal Services Agency
        Torts Branch
        901 North Stuart Street, Suite 431
        Arlington, Virginia 2223-1837
        (703) 696-1638

Also Present:  DANIEL L. WINAND, ESQ.
               Walter Reed Army Medical Center

            + + +

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1

2                C O N T E N T S

3    WITNESS:  BENJAMIN POTTER, M.D.

3

4    EXAMINATION BY:                    PAGE:

5        MR. EATON                      4

6        MR. RANIERI                    –

7

8                E X H I B I T S

9    DEPOSITION NO.      MARKED FOR IDENTIFICATION

10       1  Curriculum vitae           4

11       2  Medical records            8

12       3  Medical records            9

13

14

15

16

17

18

19

20

21

22

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

Page 4

1

2    Thereupon,

3              BENJAMIN POTTER, M.D.,

4    was called for examination by counsel and,

5    after having been duly sworn by the Notary,

6    was examined and testified as follows:

7        EXAMINATION BY COUNSEL FOR PLAINTIFFS

8              BY MR. EATON:

9        Q.    Would you please state your full

10   name for the record?

11       A.    Benjamin Kyle Potter.

12       Q.    Your address is Walter Reed

13   Hospital?

14       A.    My business address, yes.

15       Q.    You provided me with your

16   curriculum vitae.  I am just going to

17   summarize a little bit for the record.  I am

18   going to have this curriculum vitae marked as

19   Exhibit Number 1.

20            (Document referred to marked

21   Deposition Exhibit No. 1 for identification

22   and subsequently attached to the deposition.)

Feder Reporting Company
(202) 863-0000

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1      BY MR. EATON:

2      Q.    You are a graduate of the United

3  States Military Academy?

4      A.    Yes, sir.

5      Q.    And you received your Doctor of

6  Medicine from University of Chicago.  Your

7  residency in orthopedic surgery, and

8  orthopedic surgery internship all here at

9  Walter Reed.  Is that correct?

10      A.    Yes, sir.

11      Q.    And your present duties are what,

12  sir?

13      A.    I am currently a chief resident in

14  orthopedic surgery at Walter Reed.

15      Q.    I know you have heard all the

16  stories about these horrible lawyers who come

17  in and want to embarrass you and try to trick

18  you full of tricky questions, this type of

19  thing.  If you have those expectations, you

20  are going to be disappointed, because I am

21  going to treat you with respect; in fact, even

22  deference.  It is going to be a very limited

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1    examination.  It will last approximately an

2    hour to an hour and a half.  The facts are

3    fairly simple.

4              If you want to stop, confer with

5    counsel, I don't care.  If you want to take a

6    break, it is fine.  Your official duties, if

7    you have clinical duties, I am willing to

8    interrupt the deposition to accommodate you.

9              Those are the general guidelines

10   but I want to talk to you about some others.

11   If I ask you a question and you answer it, I

12   am going to assume that you understood the

13   question and answered to the best of your

14   ability.  Do you understand that?

15        A.    Yes.

16        Q.    In addition, you have to answer

17   the questions orally because the court

18   reporter is taking them down.  You can't use

19   the nonverbal communications that we normally

20   use when we conduct our normal lives.

21        A.    All right.

22        Q.    Next thing I want to impress upon

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1    you, the fact that if I should, at any time

2    during the course of the examination,

3    recharacterize any of your testimony, that is,

4    when I say, Captain Potter, you said X, Y and

5    Z, if I do it wrong or make a mistake, or

6    anything is in error, I want you to correct me

7    so we will have the best record we possibly

8    can and we develop the facts we need to make a

9    factual determination of this matter at the

10   proper time.  Okay?

11        A.    Okay.

12        Q.    Have you made any written

13   statements in this particular -- with respect

14   to this particular matter?

15        A.    No, sir.

16        Q.    To the best of your knowledge was

17   there an internal -- without telling me the

18   results of it, was there an internal

19   investigation of this matter, to the best of

20   your knowledge?

21        A.    Yes, sir.

22        Q.    Was it presented at grand rounds?

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1      A.    No, sir.

2      Q.    Was it considered at clinical

3  rounds in any way?

4      A.    Yes, sir.

5      Q.    You have been kind enough to give

6  me a document which has been produced which

7  appears to be the medical record.  Would you

8  compare this record?  I will let you have

9  Exhibit Number 2.

10          (Document referred to marked

11  Deposition Exhibit No. 2 for identification

12  and subsequently attached to the deposition.)

13          THE WITNESS:  What is the

14  question, sir?

15          BY MR. EATON:

16      Q.    I want to ask you to compare the

17  two.  Do they appear to be the same?

18      A.    Yes.  The first few pages are

19  identical but there are additional pages in, I

20  guess, Exhibit 3.

21          MR. EATON:  Why don't we mark

22  Exhibit 3 for identification.  You can mark

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1    this copy, let the Captain keep his.

2              (Documents referred to marked

3    Deposition Exhibit No. 3 for identification

4    and subsequently attached to the deposition.)

5              BY MR. EATON:

6         Q.    Captain, may I see Exhibit 2?

7              You said there are additional

8    pages in Exhibit 3 that are not in Exhibit 2?

9         A.    That's correct.

10        Q.    Let me take a look at that.

11             The first page, the first page of

12   Exhibit 2 and Exhibit 3 are the same.

13   Correct?

14        A.    Yes, sir.

15        Q.    The second page, which has the

16   number seven at the top, is the same in

17   Exhibit 2 as it is in Exhibit 3.

18        A.    Yes, sir.

19        Q.    The third page, which we have

20   numbered as page twelve, is the same.  Is that

21   correct?

22        A.    I believe the page you are on

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1    there in Exhibit 3 is the same as the page

2    four in Exhibit 2.

3         Q.    I see what you are saying.

4              MR. RANIERI:  He only has a copy

5    of the exhibit that you provided.  The other

6    copy he doesn't have.  You will probably have

7    to show him as you are going through.

8              MR. EATON:  I see what you are

9    saying.

10             BY MR. EATON:

11        Q.    So Exhibit 3 appears to be more

12   complete, have more pages, I should say, then

13   Exhibit Number 2?

14        A.    Exhibit 3 has more pages than

15   Exhibit 2.

16        Q.    But every page that is contained

17   in Exhibit Number 2 is also in Exhibit

18   Number 3?

19        A.    That's correct.

20        Q.    We are going to, in the rest of

21   this examination, we are going to use Exhibit

22   Number 3.

Feder Reporting Company
(202) 863-0000

1       A.    Okay.

2       Q.    As of January 10, 2003 where were

3  you assigned?

4       A.    To Walter Reed Army Medical

5  Center, as an orthopedic surgery resident.

6       Q.    And you were in what year of your

7  training at that point?

8       A.    I was in postgraduate year number

9  two.

10       Q.    During postgraduate year number

11  one, had all of your rotations been in the

12  orthopedic unit?

13       A.    No.  We do a rotating internship.

14  Include rotations through the intensive care

15  unit, general surgery, cardiothoracic surgery,

16  the emergency room.

17       Q.    Did you have standard procedures,

18  books, or a procedure book, which you are

19  obligated to follow in treating patients who

20  had casts put on their lower extremities?

21       A.    Did we have -- restate the

22  question, clarify?

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1    Q.    I will be happy to.  Did you have

2    standard operating procedures, or a procedure

3    book, or any type of predetermined procedures,

4    for instructing patients who receive casts on

5    their lower extremities?

6    A.    I believe there was a log kept in

7    the cast room to keep track of which patients

8    had casts placed.  With regards to published

9    standard operating procedures, I do not

10    believe those were in existence.

11    Q.    Were there any standing

12    instructions that were to be given to patients

13    or their care providers with respect to

14    precautions that they should observe if they

15    had a cast placed on the lower extremities?

16    A.    There are standard verbal

17    instructions that all patients with a cast

18    placed on the lower extremity would be given.

19    Q.    The content of the verbal

20    instructions to be given, were they written

21    anyplace?

22    A.    Not to my knowledge.

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1       Q.    Do these verbal instructions which

2   were standard, did they include instructions

3   with respect to the signs or symptoms of a

4   pulmonary embolism?

5       A.    Yes, sir.

6       Q.    Were you personally aware of the

7   instructions which were given?

8       A.    Do you mean in the course of

9   standard operating procedure or specifically

10  to Mr. Burton?

11      Q.    First of all, as part of standard

12  operating procedure.

13      A.    Yes.

14      Q.    What instructions were to be given

15  to each patient who had a cast placed on his

16  lower extremity?

17      A.    All patients were counseled as to

18  their weightbearing status, that is, whether

19  or not they are supposed to be placing weight

20  on the extremity in the cast or splint.  To

21  keep their cast dry and elevated whenever they

22  are not actively ambulating.  Risks of

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1  compartment syndrome or increased swelling or

2  pain which may occur in a cast.  And the

3  potential risk for deep venous thrombosis and

4  pulmonary embolism to include the signs and

5  symptoms of both.

6       Q.    So you were aware, at least the

7  hospital was aware, that a person who was

8  going to be immobilized for a period of time

9  was at risk for deep vein thrombosis as well

10  as pulmonary embolism.  Correct?

11       A.    I would state that there is some

12  risk of deep vein thrombosis or pulmonary

13  embolism associated with lower extremity

14  casts.

15       Q.    What do you believe that the

16  incidence was of pulmonary -- first of all, of

17  deep vein thrombosis in persons who were

18  immobilized for a period of time?

19       A.    I think that would vary greatly

20  based upon the type of injury and the reason

21  for the cast or splint.

22       Q.    With respect to being cast for a

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1  ruptured Achilles tendon, what did you believe

2  the incidence of deep vein thrombosis was in

3  such patients?

4      A.    I believe the published incidence

5  is estimated to be less than five percent for

6  deep vein thrombosis, and it may actually be

7  lower than that.

8      Q.    Do you believe as of January, 2003

9  that a risk, an incidence of five percent in

10  deep vein thrombosis was a significant risk

11  with respect to the patients?

12      A.    I believe the risk of a deep vein

13  thrombosis was less than five percent.  I

14  hesitate to give a specific number.  I think

15  that the risks are not such that standard

16  anticoagulation is warranted.

17      Q.    Not with respect to coagulation

18  was warranted.  I am just speaking now of

19  incidence.  You understand that term, right?

20      A.    Yes, sir.

21      Q.    And you believe it was less than

22  five percent.  What would be your estimate or

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1    what was your belief that the incidence was as

2    of January, 2003?

3         A.    Probably around one percent.

4         Q.    And what is the basis of that

5    belief?

6         A.    My own experience and reading the

7    orthopedic literature.

8         Q.    What were the risk factors which

9    increase the risk of a deep vein thrombosis?

10         A.    In Mr. Burton specifically or any

11    patient?

12         Q.    In any patient.

13         A.    Any patient in general.  Smoking.

14    A significant trauma such as a broken femur,

15    broken spine, broken pelvis.  Surgery, which

16    Mr. Burton did not have.  Being bedridden,

17    unable to get out of bed at all.

18         Q.    Would immobilization for an

19    extended period of time, would that be a risk

20    factor?

21         A.    That would be Mr. Burton's only

22    risk factor.

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

Page 17

1    Q.    And that was your belief when you

2    treated him?

3    A.    Yes, sir.

4    Q.    Were you aware of any other risk

5    factors which Mr. Burton had at the time that

6    you were treating him?

7    A.    Not that I can recall.

8    Q.    Had you made a search of the

9    medical literature prior to that time to see

10   if he had any additional risk factors?

11   A.    I was familiar in general with the

12   medical literature regarding deep venous

13   thrombosis and orthopedic cases at that time.

14   Q.    Would it be a fair statement to

15   say, then, that in January, 2003, that it was

16   not standard operating procedure to advise

17   patients that they had any risk factors other

18   than immobilization in patients such as

19   Captain Burton?

20         MR. RANIERI:  I will object as to

21   a mischaracterization of his testimony.

22         You can answer.

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1        BY MR. EATON:

2        Q.    First of all, remember, I warned

3   you about mischaracterization.  If I

4   mischaracterize your testimony, please correct

5   me.  You are not going to hurt my feelings.

6        A.    I will state that I believe

7   Mr. Burton's only risk factor was that he had

8   an Achilles tendon rupture being treated in a

9   splint and then a short leg cast.  In the

10  absence of additional risk factors, he would

11  certainly not be counseled as to what risk

12  factors were but, rather, just the signs and

13  symptoms of deep venous thrombosis or

14  pulmonary embolism.

15       Q.    When you say the fact that he had

16  his leg -- first of all, you put him in a

17  splint.  Is that correct?

18       A.    Yes.

19       Q.    And he was put in an equinine?

20       A.    Equinus.

21       Q.    Equinus position?  That's horse,

22  right?

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1    A.    Yes.

2    Q.    When you put it in that position

3  he wasn't in a cast, right?

4    A.    He was initially in a splint.

5    Q.    I just want to make sure, the fact

6  that his foot was immobilized, do you think

7  that was the only risk factor that he had?

8    A.    His foot was immobilized for

9  treatment of his Achilles tendon rupture,

10  that's correct.

11    Q.    Was the fact that he was told not

12  to be weightbearing and that he was in bed for

13  a period of time, and his wife was waiting on

14  him hand and foot, would that be an additional

15  risk factor?

16    MR. RANIERI:  Objection.  Assumes

17  facts not in evidence.

18    Please answer.

19    THE WITNESS:  He was instructed to

20  remain nonweightbearing in his splint and,

21  later, his cast, and to ambulate with

22  crutches, and to keep his lower extremity

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1    elevated whenever not actively ambulating.

2    But he was never instructed that he could not

3    ambulate with crutches and he was given

4    crutches specifically for that reason.  So he

5    was not, at least pursuant to any of my

6    medical instructions, on bed rest or to be

7    waited on hand and foot.

8              BY MR. EATON:

9         Q.    So it is your opinion, then, that

10   he could have, in fact, walked around -- not

11   walked but he could have ambulated with

12   crutches and he was not to be bedridden for

13   the period of time?

14        A.    That's correct.

15        Q.    The fact that he was bedridden,

16   would that have been a risk factor for him?

17        A.    If he was completely, yes, if he

18   was bedridden, that would be a risk factor.

19        Q.    Did you ever instruct him that he

20   should not be bedridden?

21        A.    I was never aware that he was

22   bedridden so, no, I did not instruct him

1    specifically not to be.

2         Q.    Your testimony is, the only risk

3    factor that he had was the fact that his leg

4    was immobilized -- first of all, in a splint?

5    The splint, was that a risk factor, while he

6    was immobilized in a splint?

7         A.    Yes, sir.

8         Q.    Was it a risk factor while he was

9    immobilized in a cast?

10        A.    Yes, sir.

11        Q.    And those are the only risk

12   factors of which you were aware at the time

13   you were treating him back in year 2003,

14   right?

15        A.    That he was being treated in a

16   cast -- immobilized in a cast and splint for

17   treatment of his Achilles tendon rupture would

18   be his only risk factor, yes.

19        Q.    Did you review his records prior

20   to the time -- at or about the time you

21   treated him?

22        A.    I do not recall specifically but I

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1    am not sure that they were ever made available

2    to me.

3         Q.    Did you ever request them?

4         A.    I don't recall, sir.

5         Q.    Would the fact, if it were known

6    to you, that he had had an incident in which

7    it was suspected that he had a deep vein

8    thrombosis, what if anything would you have

9    done had you known that?

10         MR. RANIERI:  Objection.  Assumes

11    facts not in evidence.

12         Please continue.

13         THE WITNESS:  I would have

14    examined the incident and, depending on what

15    that showed, possibly taken different action,

16    or at least more specific in my counseling.

17    However, in reviewing the patient's medical

18    record, it appears that when he had had prior

19    ultrasounds to evaluate him for deep venous

20    thrombosis, of which I was not aware, the

21    studies were negative.  So in the absence of a

22    clinically proven deep vein thrombosis, having

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1  these negative ultrasounds in his past might

2  actually lower one's index of suspicion for

3  him having a clot at this point.

4          BY MR. EATON:

5      Q.    Explain that to me, why the fact

6  that it had been evaluated in the past, after

7  a cross-country trip, explain to me how in

8  your opinion, sir, that that would lower the

9  probability that he had a deep vein thrombosis

10  in January, 2003?

11      A.    I did not state it would lower his

12  probability.  But, clinically, the fact that

13  he had had a negative study is not going to do

14  anything to make him more predisposed to have

15  a clot.

16      Q.    Since the year 2003 has Walter

17  Reed published guidelines setting forth the

18  risk factors and the precautions to be taken

19  with persons whose lower extremities are being

20  immobilized for a period of more than a week?

21      A.    Our medical practice and how we

22  approach and treat patients has not changed

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

Page 24

1    but we have formalized a cast care instruction

2    sheet in order to document for the record that

3    all those items were covered.

4        Q.    You told me that this was the

5    standard operating procedure for the person

6    who was placed in a cast to be given

7    instructions concerning the signs and symptoms

8    of an actual or impending deep vein thrombosis

9    or pulmonary embolism.  Correct?

10       A.    I believe that's correct.

11       Q.    Did you give this information to

12   Captain Burton at the time you placed the cast

13   or put him in a splint?

14       A.    Yes, sir.

15       Q.    Where did you give them to him?

16       A.    I gave them to him verbally in the

17   emergency room.

18       Q.    Who was present when you gave the

19   instructions to him?

20       A.    I do not specifically recall.

21       Q.    Who was the physician attending

22   him in the emergency room?

1        A.    Do you mean insofar as the

2    emergency room physicians?

3        Q.    Yes, sir.

4        A.    (Pause).  I am not sure if I am

5    reading this correctly but I believe that this

6    is Dr. Murthy's signature, which would suggest

7    that she was on that evening.

8        Q.    Is she still at the hospital?

9        A.    Yes, sir.

10       Q.    Where is she located?

11       A.    In the emergency room.

12       Q.    Is she civilian or military?

13       A.    She is civilian, sir.

14       Q.    What is her first name?

15       A.    I don't know.

16       Q.    Tell me the circumstances -- what

17   did you tell him the signs and symptoms of an

18   impending pulmonary embolism were?

19       A.    I don't recall the specific

20   conversation but, in general, it would include

21   significant swelling above the calf.  It would

22   include the thigh level.  Erythema of the leg.

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

Page 26

1   Increased pain in the leg.  Chest pain and

2   shortness of breath.

3        Q.    Do you have, as you sit here,

4   actual recall of telling that to Captain

5   Burton?

6        A.    I am certain that we had a

7   detailed discussion of the risks of operative

8   and nonoperative treatment for his Achilles

9   tendon rupture.  I know for certain that that

10  took place.  And part of that discussion is

11  always to, in addition to the risks of

12  bleeding, infection, or tendon rerupture,

13  would include a discussion of deep vein

14  thrombosis and pulmonary embolism.  I always

15  cover that.

16       Q.    Was his wife present when you gave

17  him these instructions?

18       A.    I believe she was there for the

19  visit, sir, but I don't know if she was there

20  at that specific time.  I do not recall.

21       Q.    That's what I am trying to get at,

22  Captain.  As you sit here, today, do you have

Page 27

1    specific recall, not what you normally do, not

2    what your custom, habit and routine practice

3    was, but with respect to this patient, do you

4    have specific recall what you told him?

5        A.    I would state that I always do it,

6    as opposed to just custom or habit, but, no, I

7    do not have specific recall of that.

8        Q.    Do you have specific recall as to

9    whether or not his wife was present?

10       A.    Not during that portion of the

11   conversation.  No, I do not recall.

12       Q.    Do you have specific recall as to

13   whether Dr. Murthy was present?  Is it Murphy

14   or Murthy?

15       A.    I believe that it is Murthy,

16   M U R T H Y.

17       Q.    Do you have specific recall as to

18   whether Dr. Murthy was present?

19       A.    No, sir, I do not recall.

20       Q.    Did you include in your notes,

21   anyplace in the notes, and if it is not in

22   Exhibit Number 3, is there any place in your

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1    notes where you indicate that you counseled

2    Captain Burton concerning the risks associated

3    with immobilization of his leg in a cast in

4    the lower extremities?

5        A.    No, sir, not to my knowledge.

6        Q.    We can agree, can we not, that if

7    a person's lower extremity is immobilized in a

8    cast, that it increases the risk of a deep

9    vein thrombosis?

10       A.    I would agree that the risk of

11   someone in a cast, lower extremity cast, is

12   higher than someone who is not in a lower

13   extremity cast.  That's correct.

14       Q.    Would you agree a person who gets

15   a deep vein thrombosis is at high risk of

16   having pulmonary embolism?

17       A.    I would be cautious as to how I

18   characterize high risk.  But, certainly, they

19   are at some risk for that, yes.

20       Q.    Untreated, if a person is in a

21   cast and he has edema -- what is edema?

22       A.    Swelling.

1        Q.    And edema, if a cast, a casted

2    person, does this increase the risk of deep

3    vein thrombosis?

4        A.    Not specifically, no.

5        Q.    Does edema increase the risk of

6    pulmonary embolism?

7        A.    Not beyond whatever the risks of

8    whatever was causing the edema.

9        Q.    I am going to direct your

10   attention to Plaintiff's Exhibit Number 3.

11   You have a page number on the bottom as nine

12   but it is the first page of Exhibit Number 3.

13            Whose writing is on this page?

14       A.    I believe that's all mine, sir.

15       Q.    And this is a record of a

16   consultation.  Correct?

17       A.    Yes, sir.

18       Q.    And you were called to the

19   emergency room by Dr. Murthy?

20       A.    Yes, sir.  Or one of her

21   associates.

22       Q.    And I assume that you were at that

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1    time a second year resident?

2        A.    Yes, sir.

3        Q.    And that you were called to do a

4    consultation with respect to this patient in

5    the emergency room who had come with trauma to

6    his Achilles tendon.  Correct?

7        A.    I would say that he had come with

8    a suspected Achilles tendon rupture.

9        Q.    Whose writing is on this, appears

10   in this particular record?

11       A.    Talking just about the first page?

12       Q.    Yes, sir.

13       A.    With nine at the bottom?  My own.

14       Q.    Is all of it your writing except

15   the signature?  Unless your signature, as

16   well?

17       A.    I believe this is all my writing.

18       Q.    If you could be kind enough, if

19   you can read the top, ortho, ER, 10th of

20   January, it says left Achilles rupture.  Is

21   that correct?

22       A.    Yes, sir.

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1      Q.    Provisional diagnosis, what is

2   that written in that particular --

3      A.    SAA, meaning same as above,

4   implying left Achilles rupture.

5      Q.    And Murthy, did Dr. Murthy sign

6   that or is that just the name of the person

7   that you wrote --

8      A.    That's just what I wrote, the last

9   name.

10     Q.    You gave a history.  Would you

11  please read the history for me?

12     A.    62 year old African-American male

13  sustained left Achilles tendon injury this

14  afternoon while playing basketball.  He

15  reports running up court and feeling suddenly

16  that something heavy had fallen on the back of

17  his leg, and he felt a pop.  Patient then came

18  to the WRAMC, Walter Reed Army Medical Center

19  emergency room.  Reports a history of mild

20  Achilles tendon soreness after last week's

21  basketball game.  Denies history of

22  fluoroquinolone use or steroid injection.

Page 32

1      Q.    Fluoroquinolone is an antibiotic

2  which is known to affect integrity of tendons.

3  Correct?

4      A.    That's correct.

5      Q.    And the other drug is a steroid

6  which is also known to weaken tendons.

7  Correct?

8      A.    Yes, sir.

9      Q.    You had an x-ray taken.  Right?

10     A.    An x-ray was done.  I would have

11 ordered an x-ray if someone else hadn't, but I

12 am not sure if the ER ordered it or I did.

13     Q.    It says x-ray there.  Can you read

14 the rest of that note?  Is that your writing,

15 as well?

16     A.    Yes.  It says edema and loss of

17 soft tissue shadow in tendon sheath.

18     Q.    What does that mean, sir?

19     A.    It means that his lateral

20 radiograph you can see soft tissue swelling

21 and a change in the opacity of the soft

22 tissues, suggestive of an Achilles tendon

1    disruption.

2         Q.    What else?  PE, what does that

3    mean?

4         A.    That is physical exam.

5         Q.    Would you please read the entries

6    related to your physical examination?

7         A.    It says NAD, which means no

8    apparent distress.  WN slash WD, well

9    nourished, well developed.

10        Q.    I am sorry, I didn't hear that,

11   sir.

12        A.    Well nourished, well developed.

13        Q.    Okay.

14        A.    Neurovascularly intact left lower

15   extremity.  Positive Thompson test.

16        Q.    What is a Thompson test?

17        A.    It is a cast squeeze performed

18   with the patient's knee flexed and their lower

19   extremity relaxed with the ankle hanging off

20   the side of a chair or table.

21        Q.    At any time during your treatment

22   of him did you ever do a Horner's test?

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1      A.    I am not sure if I am familiar

2   with that term.

3      Q.    So as of the time you were

4   treating him, you weren't aware of what a

5   Horner's test was?

6      A.    No.  Not that would relate to this

7   patient.

8      Q.    Thank you.  Go ahead, sir.

9      A.    Thompson test.  Positive, tender

10  to palpation, and ecchymosis, which means

11  bruising, over the distal Achilles.

12     Q.    You have under that KP.  What does

13  that mean?

14     A.    Where are you seeing KP?  Oh, AP,

15  assessment and plan.

16     Q.    This is a SOAP note that you are

17  writing?

18     A.    Essentially.

19     Q.    Go ahead, sir.

20     A.    62 year old African-American male

21  with acute complete Achilles tendon rupture.

22  Pain management per ER.  Splint in gravity

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

Page 35

1    equinus.

2         Q.    What that means is that you put

3    him into what?

4         A.    It means he was placed into a

5    padded posterior splint with his ankle pointed

6    as if he was pointing his toes, which is

7    equinus.  As his foot would sit as if it were

8    relaxed and dangling with the weight of

9    gravity pulling on it.

10               (Discussion off the record.)

11               THE WITNESS:  Well padded

12    posterior splint.

13               BY MR. EATON:

14         Q.    Explain to us what that means,

15    sir.

16         A.    It means he was wrapped with

17    Webril, W E B R I L, which is just cast

18    padding sufficient to appropriately position

19    the foot but keep his lower extremity

20    comfortable in the splint to prevent the

21    plaster splint from irritating the skin.

22         Q.    We can agree that an Achilles

Page 36

1    tendon rupture can be a very painful thing.

2    Is that correct?

3        A.    They are usually extremely painful

4    when they first occur.

5        Q.    And the pain abates, in your

6    experience, sir, approximately how long after

7    the injury?

8        A.    That varies significantly from

9    patient to patient.  Most of the pain occurs

10   right at the time of the incident.  But

11   substantial residual soreness can persist for

12   weeks.

13       Q.    For weeks?

14       A.    Yes.

15       Q.    Could you give me a range, sir?

16       A.    I think it would be a very broad

17   range.

18       Q.    Can you give me a range?

19       A.    Sure.  One, two, eight weeks.

20       Q.    Do you know in Captain Burton's

21   case how long he was in pain after his injury?

22       A.    Pursuant to my notes which you

Page 37

1    have provided, he was still tender to

2    palpation, meaning that he still had

3    tenderness when you pressed on his Achilles at

4    his 15 January follow-up appointment, which

5    would be five days later.  It appears all that

6    tenderness had gone away at the time of his

7    February 7 follow-up appointment, the last

8    time I saw him.

9         Q.    This time, you were called on the

10   10th and it says follow-up with ortho next

11   week.

12             That is the clinic which you are

13   associated with.  Is that correct?

14        A.    Yes, sir.

15        Q.    Did you have a supervisor?  Did

16   you have a chief resident at that time?

17        A.    I would have had a chief resident

18   who was on call with me that night as well as

19   a staff physician.

20        Q.    Who was the staff physician?

21        A.    I don't recall.

22        Q.    Did the staff physician examine

Page 38

1    Captain Burton on the night of injury?

2        A.    No, sir.

3        Q.    Did the chief resident examine the

4    patient on the night of the injury?

5        A.    I do not specifically recall.  It

6    is possible that he did.

7        Q.    When you say staff physician, is

8    that a civilian physician who works on the

9    ward or is it a military person?

10        A.    We have both civilian and military

11    orthopedic staff physicians at Walter Reed.

12    It implies that they have completed their

13    residency training.

14        Q.    You are familiar with the term

15    attending physician that is used ordinarily.

16    Would the staff physician be of the nature of

17    an attending physician?

18        A.    I would use those terms

19    interchangeably.

20        Q.    Such a person is responsible for

21    the overall care and supervision of the

22    patient?

1          A.    Yes, sir.

2          Q.    You don't remember the name of the

3     attending physician for Captain Burton.  Fair

4     statement?

5          A.    That's correct.  I don't recall

6     who that was.  I know all our staff physicians

7     from that time and presently but I am not sure

8     who was on call that night.

9          Q.    And you, of course, did not

10    consult the staff physician at night because

11    this was an after hours call.  Correct?

12         A.    I don't think that's correct.  I

13    would have called my chief resident and told

14    him what I had and what my treatment plan was.

15    And he would have relayed that to the staff

16    physician.

17         Q.    This is, again, not reflected in

18    your records.  Correct?

19         A.    I think that's correct.

20         Q.    And you don't know who the chief

21    resident was on that particular evening.

22    Correct?

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1    A.    No, sir, I don't recall.

2    Q.    Would you physically describe what

3  Captain Burton looked like?

4    A.    Sir, he was 62.  He looked

5  approximately his stated age.  He was an

6  African-American gentleman.  Relatively good

7  shape.

8    Q.    What do you mean by that?

9    A.    Meant that he was slender.  He was

10  not heavy.

11    Q.    Approximately how much did he

12  weigh?

13    A.    Sir, I don't recall.  If I were

14  guessing, I would say maybe 165 pounds.

15    Q.    165 pounds?  Did he have any

16  facial hair?

17    A.    I believe he had a mustache, sir,

18  but I am not certain.

19    Q.    Approximately how tall was he?

20    A.    I am not certain as to that

21  because, usually, when I saw him, he was

22  sitting down for me to evaluate his leg.

1        Q.    What was his complexion?  He was

2   African-American.  Was he light complected,

3   dark complected, medium complexion?  What was

4   his complexion?

5        A.    To the best of my recollection, I

6   would describe him as medium to dark.

7        Q.    Meaning brown skin?

8        A.    Yes, sir.

9        Q.    With respect to his hair, what

10  type of hair did he have?  Was he bald?  Did

11  he have hair on his --

12       A.    I don't specifically recall.

13       Q.    What was the length of his hair?

14  Do you recall?

15       A.    No, sir.

16       Q.    At the time that you saw this

17  gentleman, were you aware, did he have any

18  pathological medical conditions other than the

19  ruptured Achilles tendon?

20       A.    The only condition that was

21  reported, other than that, that was reported

22  to myself or the ER doctors is reflected in

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

Page 42

1    the ER note which you have in front of you

2    which reflects degenerative joint disease or

3    DJD.

4         Q.    Where was there degenerative joint

5    disease?

6         A.    I don't specifically remember.

7         Q.    Did he have a history of

8    arthritis?

9         A.    I believe that emergency medicine

10   note is implying that the patient reported a

11   history of degenerative joint disease, which

12   is a type of arthritis.

13        Q.    Can we agree that he also reported

14   that he was playing basketball at 62 years old

15   at the time of his injury?  Correct?

16        A.    Yes, sir.

17        Q.    Do you have any reason to believe

18   that his general state of health was anything

19   other than excellent?

20             MR. RANIERI:  Objection.  Assumes

21   facts not in evidence.  Also, speculation.

22             Please answer.

1        BY MR. EATON:

2        Q.    You may answer.

3        A.    Can you repeat the question?

4        Q.    Do you have any reason to believe

5    that his health, when you were treating him,

6    your own impression that you gave, from your

7    examination of him, and the records, any other

8    source, that the state of his health was

9    anything other than excellent?

10        MR. RANIERI:  Same objection.  It

11    calls for speculation and/or assumption of

12    facts that are not currently in evidence.

13        Please continue.

14        THE WITNESS:  No, sir.

15        BY MR. EATON:

16        Q.    Directing your attention to page

17    two, did there come a time that you actually

18    saw him again, Captain Burton again?

19        A.    After the ER visit?

20        Q.    Yes, sir.

21        A.    Yes, sir, I saw him about five

22    days later.

Feder Reporting Company
(202) 863-0000

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1    Q.    What is page -- it has at the top

2    page seven, at the bottom, ten, what is this

3    particular document, page two?  I am going to

4    renumber -- where is the original?  Is that

5    the official copy?

6    A.    That is the one that has the --

7    Q.    I am going to put at the bottom in

8    the center here, in the square box, renumber

9    the whole thing.

10    One, two, three, four, five, six,

11    seven, eight, nine.

12    I am referring to, now, what I

13    have marked as Exhibit Number 3.  I want you

14    to see, is that the same page that you have

15    before you there?

16    A.    It appears to be.

17    Q.    What is this page?

18    A.    It is hard to make out some of the

19    computer printed text but I believe this is

20    his emergency room note from the night of

21    injury.

22    Q.    This is before you saw anything?

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1        A.    Most of this paperwork would have

2    been done before they called me.  But you can

3    see that ortho consult, spoke with Dr. Potter

4    at 1830 or 6:30.  So the bottom part was

5    probably written after I saw him.

6        Q.    In other words, page one was a

7    consultation, you believe, that was done as a

8    result of him being seen initially in the

9    emergency room.  Is that a fair statement?

10        A.    Yes, sir.

11        Q.    And the consultation with you was

12    actually at approximately, I think you said,

13    18 -- what did you say?

14        A.    I said 1830.

15        Q.    In civilian parlance, that would

16    normally be 6:30 p.m.  Correct?

17        A.    Yes, sir.

18        Q.    Did you review the emergency room

19    note while she came to see you in the

20    consultation?

21        A.    I don't specifically remember but

22    normally what happens, I will come down, talk

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

Page 46

1    to the emergency physicians, review their note

2    and then go and evaluate the patient.

3         Q.    And this would be your custom,

4    habit and routine practice for you to do this.

5    Is that correct?

6         A.    That's correct.

7         Q.    You told me this was a computer

8    generated note.  What does that mean?

9         A.    That means some of the faded text

10   at the top in the left margin and the bottom

11   was printed up from the emergency room

12   computers when they checked him into the

13   emergency room.

14        Q.    Explain that to me, sir.  What do

15   you mean?

16        A.    I mean, when Mr. Burton was

17   registered at the front desk of the emergency

18   room, this is a standard form that gets

19   generated specific to that patient and that

20   visit.

21        Q.    So what you are saying is, in

22   between the places where we see handwriting,

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1    that there actually are words in there which

2    they fill in blocks, so to speak?

3          A.    There are definitely words there

4    in different sections.

5          Q.    Is there any way, to your

6    knowledge, that this information could be

7    retrieved electronically?

8          A.    I am not certain as to the ability

9    of the ER computers to reproduce Mr. Burton's

10   specific note.  The emergency room may be able

11   to print off a note.  I don't know if they

12   have changed their format.

13         Q.    Is there any of your writing that

14   appears on this page?

15         A.    I don't believe so, sir.

16         Q.    Was he given an instruction sheet

17   upon his discharge from the hospital on the

18   10th?

19         A.    He would have been given a copy of

20   this sheet as well as my consultation note.

21         Q.    As well as your consultation note?

22         A.    (Indicating.)

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

Page 48

1    Q.    Was he given anything else upon

2    his discharge on the 10th?

3    A.    I am not sure, sir.  The ER does

4    have some standardized forms that they give

5    patients on discharge, but I am not sure what

6    he would have received from them.

7    Q.    Was he given any written

8    instructions with respect to precautions he

9    should take to prevent deep vein thrombosis?

10         MR. RANIERI:  I will object as to

11   requesting the witness to speculate.  He can

12   certainly testify to what he knows as to what

13   was given.  What someone else knows, he may

14   not know.

15         THE WITNESS:  I am not certain,

16   sir.

17         BY MR. EATON:

18   Q.    Did you give him any written

19   instructions with respect to what he should do

20   to prevent deep vein thrombosis from

21   occurring?

22   A.    Not written instructions, no.

1    Q.    Did you give him any written

2    instructions with respect to what were the

3    signs and symptoms of deep vein thrombosis?

4    A.    Not that I recall.

5    Q.    Did you instruct anyone else to

6    give him written instructions with respect to

7    the signs and symptoms of deep vein

8    thrombosis?

9    A.    Not that I can recall.

10    Q.    Did you give him any written

11    warning that he was at risk for pulmonary

12    embolism?

13    A.    We take issue with the phrasing

14    that he is at risk for pulmonary embolism.

15    But I did not give him any written

16    instructions to that effect.

17    Q.    Did you give him any written

18    instructions as to what the signs and symptoms

19    were of pulmonary embolism?

20    A.    Only verbal instructions.  Not

21    written.

22    Q.    Is there any particular reason why

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1    you did not give him written instructions?

2         A.    I would say that he was a

3    reasonable and lucid, responsible individual.

4    I felt that our verbal conversation was

5    sufficient.

6         Q.    But you have no specific recall of

7    giving this particular patient these

8    instructions that you have just described.

9    Correct?

10        A.    Other than that I always do it,

11   no.

12        Q.    Did you give his care provider,

13   his wife, any instructions concerning the

14   signs and symptoms of deep venous thrombosis?

15        A.    I am not certain whether or not

16   she was present for the risks, benefits,

17   alternatives, counseling portion of our visit.

18   I did not counsel her with regard to anything

19   separately from Captain Burton.

20        Q.    At the time that you advised him

21   of the risks and benefits of different

22   treatment modalities for a ruptured Achilles

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1    tendon, did you make any records of this

2    counseling session?

3         A.    No, sir, not besides the notes

4    that you have.

5         Q.    Turning your attention to page

6    two, I think you told me -- was there anything

7    on this page -- I think you told me there was

8    none of your writing on that page?

9         A.    Talking about page two in the ER

10   note?

11        Q.    Yes, sir.

12        A.    No, there is none of my writing on

13   that page.

14        Q.    Let's go to page three.  Did you

15   make any entries on that particular page?

16        A.    Did I make any entries on this

17   page?

18        Q.    Yes.

19        A.    I believe that's all my

20   handwriting.

21        Q.    Who was the chief of the

22   orthopedic service at Walter Reed in January

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1   of the year 2003?

2           A.    I believe that was Dr. Doukas.

3           Q.    Where is Dr. Doukas now?

4           A.    He is our department chief.

5           Q.    He is still here?

6           A.    Yes, sir.

7           Q.    Have any changes been made since

8   January, 2003 with respect to giving

9   instructions to patients informing them of the

10  risk of deep vein thrombosis?

11          A.    We have a formalized handout in

12  order to document that those instructions were

13  given but our practice of medicine and the

14  instructions that they receive have not

15  changed.

16          Q.    What do these instructions say

17  with respect to the risk of deep vein

18  thrombosis in patients who have their lower

19  extremities immobilized?

20          A.    I would have to look at the

21  instruction sheet to tell you specifically

22  what it says.

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1    Q.   But as you sit here today, are you

2  able to summarize it for me and tell me, first

3  of all, what are the signs and symptoms of a

4  deep vein thrombosis?

5         MR. RANIERI:  Objection.  That is

6  a compound question.

7         MR. EATON:  I am sorry?

8         MR. RANIERI:  That is a compound

9  question.  You asked about summarizing it and

10  you asked what the risk factors were.

11         MR. EATON:  I will be happy to

12  break it up.

13         BY MR. EATON:

14    Q.   Does this, to your knowledge, do

15  the present instructions inform patients of

16  the risk factors for deep vein thrombosis?

17    A.   I believe the present instructions

18  state that cast immobilization may increase

19  your risk of deep vein thrombosis.

20    Q.   And you can agree, I think you

21  told me earlier, that this was known as of

22  January, 2003.  Correct?

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1          A.    That cast immobilization is a risk

2     factor, yes.

3          Q.    Was immobilization using a splint,

4     is that a risk factor?

5          A.    That is essentially the same as

6     cast immobilization, so yes.

7          Q.    What was your understanding, sir,

8     as of January, '03 were the actual risk

9     factors, not the ones that he had, but the

10    risk factors you believe increase the risk of

11    deep vein thrombosis?

12          MR. RANIERI:  Objection.  Asked

13    and answered.

14          THE WITNESS:  I would state that

15    they were lower extremity immobilization,

16    immobility or paralysis, cancer, smoking,

17    surgery.  Especially significant surgery on

18    the pelvis or lower extremity.  History of

19    prior deep vein thrombosis or pulmonary

20    embolism.  Known hypercoagulable state.  I

21    think those were the big ones.

22          BY MR. EATON:

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1      Q.    What was his hematocrit on

2  admission?

3      A.    Beg your pardon?

4      Q.    What was Captain Burton's

5  hematocrit on admission?

6      A.    I don't know, sir.

7      Q.    Wouldn't it be important that you

8  knew if he were in a hypercoagulable state?

9      A.    That is not something that is

10 routinely screened for.  And a hematocrit

11 wouldn't tell you that.

12     Q.    If, in fact, the hematocrit was

13 high, it could be, it could show that he was

14 dehydrated.  Correct?

15          MR. RANIERI:  Objection.  Calls

16 for speculation.  Assuming facts not in

17 evidence.

18          Please answer.

19          THE WITNESS:  Can you restate the

20 question?

21          BY MR. EATON:

22     Q.    If, in fact, his hematocrit was

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1    greater than the normal range -- what is the

2    normal range for a hematocrit in a man of his

3    age?

4         A.    A man of his age?  Probably around

5    36 to 43 roughly.

6         Q.    Let's just say hypothetically that

7    his hematocrit was 50.  What, if anything,

8    would that mean with respect to his

9    hypercoagulable state?

10        A.    I would say it might be suggestive

11   of dehydration, as he just came from playing

12   basketball.  It may also be indicative of lab

13   error.  That's about it.

14        Q.    What was his prothrombin time or

15   partial prothrombin time?

16        A.    I don't know.

17        Q.    Would an abnormal prothrombin time

18   or partial prothrombin time be indicative of a

19   hypercoagulable state?

20        A.    Relatively rarely, sir.

21        Q.    What lab parameters would be

22   evidence of a hypercoagulable state?

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

Page 57

1      A.    I would state that there are

2  numerous labs that could be suggestive of a

3  hypercoagulable state and the workup for a

4  hypercoagulable state I would usually defer to

5  a hematologist or an expert in that field.

6      Q.    Yes, sir.  I am speaking of you as

7  a consultant in considering what the risk

8  factors are, did you consider, did you make a

9  determination, did you make an effort to

10 determine if, in fact, he was in a

11 hypercoagulable state when he was admitted?

12     A.    Routine screening for patients

13 such as Mr. Burton is not indicated.  No, I

14 did not.

15     Q.    I take it, then, that you did not

16 make an investigation to determine if he was

17 in a hypercoagulable state?

18          MR. RANIERI:  Objection.  Asked

19 and answered.

20          Go ahead and answer.

21          THE WITNESS:  I believe that's

22 correct.

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1      BY MR. EATON:

2      Q.    Go right ahead, sir.  Would you

3  please read what is on page three of Exhibit

4  Number 3?

5      A.    Just my handwriting?

6      Q.    Yes, sir.

7      A.    62 year old African-American male,

8  five days status post left Achilles tendon

9  rupture playing basketball.  Follow up for

10  change from splint to cast.

11      Q.    Additional comments.  What is your

12  writing under there?

13      A.    It says, neurovascularly intact.

14  Positive tenderness to palpation at Achilles

15  insertion.  Moderately increased swelling.

16          Do you want me to continue?

17      Q.    Please, sir.

18      A.    Short leg cast in equinus.

19  Assessment and plan.  Closed treatment of left

20  Achilles tendon rupture.  Short leg cast in

21  equinus times six weeks.  Nonweightbearing

22  times -- I think that is a three.  It is hard

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

Page 59

1    to say on this copy.

2         Q.    Do you want to look at mine?

3    Let's look at the original.  I want to be

4    certain.  It said three weeks, I believe.

5         A.    (Pause).  It still looks like a

6    three.  But I believe this is a copy, as well.

7         Q.    Do you have any basis for

8    believing that was anything other than three?

9         A.    No, sir.

10             It says, follow up in three weeks,

11   elevation, and then my name and signature.

12        Q.    When you said elevated, you meant

13   for him to have his leg elevated as much a

14   possible.  Correct?

15        A.    And for him to keep his leg

16   elevated whenever practicable, whenever he was

17   not ambulating with his crutches that we

18   provided.

19        Q.    Let me see if I understand that.

20             It is impossible to elevate your

21   leg while you are ambulating with crutches.

22   Correct?

1        A.    Simultaneously, correct.

2        Q.    And to elevate the leg, the

3    purpose is to prevent the collection of fluid

4    in the extremities.  Correct?

5        A.    To prevent him from swelling too

6    much inside his cast and to be comfortable.

7    That's correct.

8        Q.    Because if there is too much

9    swelling inside of his cast, it can compromise

10    the blood flow, create stasis, and can, in

11    fact, contribute to causing blood clots.

12    Correct?

13        A.    The reason for elevating to

14    control his swelling is to keep him

15    comfortable, because the cast is of a fixed

16    volume and swelling inside the cast can lead

17    to increased pain and increase risk of things

18    like compartment syndrome, which he is at very

19    low risk for.

20        Q.    My question, probably you didn't

21    understand my question.  It probably wasn't

22    very artful.

Feder Reporting Company
(202) 863-0000

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1          My question was if, in fact, there

2    is swelling inside of a person's cast, that it

3    can compromise blood flow.  Correct?

4          A.    I would state that it is

5    theoretically possible for swelling to

6    compromise blood flow.  That would be true

7    inside of a cast.

8          Q.    If, in fact, there is a compromise

9    of blood flow, it can create a condition known

10   as stasis.  Correct?

11         A.    Stasis, yes.

12         Q.    If stasis occurs it can trigger

13   the coagulation cascade.  Correct?

14         A.    Stasis is a contributing factor

15   which the cast, itself, contributes to.

16         Q.    And, in fact, it can trigger the

17   release of thrombin.  Correct?

18         A.    Yes.

19         Q.    And if thrombin is released, it

20   can create the coagulation cascade and can

21   lead to the formulation of blood clots.

22   Correct?

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1    A.    I think you are going down a

2    relatively slippery slope but that is roughly

3    accurate with regard to the coagulation

4    cascade.

5    Q.    When you gave these instructions

6    to -- speaking now on the 15th.  I think it is

7    the 15th, sir?  Is that right?

8    A.    That's what it says on my note you

9    provided, sir.

10    Q.    When it was given on the 15th you

11    intended for him to follow your instructions,

12    did you not?

13    A.    Yes, sir.

14    Q.    And when you gave him these

15    instructions you gave him unequivocal

16    instructions that he was to elevate his leg

17    whenever practicable.  Correct?

18    A.    Whenever practicable meaning when

19    he is not ambulating with his crutches, yes.

20    Q.    And you did this to prevent

21    physical injury, further injury and compromise

22    of his leg while it was in a cast.  Correct?

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1          A.    I believe that's correct.

2          Q.    And you did that to prevent

3    swelling, to minimize -- you couldn't prevent

4    it altogether but to minimize swelling and the

5    effects thereof.  Is that a fair statement?

6          A.    I believe so, yes.

7          Q.    So we can agree, then, it would

8    not be unreasonable for Captain Burton to

9    follow your instructions that you gave him at

10   the time that you discharged him on the 15th

11   of January, 2003.  Correct?

12         A.    I am not sure what your question

13   was.

14              MR. EATON:  Could you read it

15   back?

16              (The pending question was read by

17   the reporter.)

18              THE WITNESS:  Yes, it was my

19   intent for him to follow my instructions.

20              BY MR. EATON:

21         Q.    Was his wife present at the time

22   you saw him on January 15th?

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1         A.    I believe so but I do not

2    specifically recall.

3         Q.    Where did you see him on

4    January 15th, if you recall, sir?

5         A.    In the Walter Reed orthopedic

6    clinic, in the cast room.

7         Q.    In the cast room?

8         A.    Which is a part of the clinic.

9         Q.    I am a little bit confused and I

10   am going to ask your help, sir.

11             Is the risk of thromboembolism, is

12   it the same if a person is in a splint, the

13   same as it is within a cast?

14        A.    I am not aware of any literature

15   to suggest that there is a difference between

16   the two.

17        Q.    So at the time that you treated

18   him it was your believe that there was no

19   difference in the incidence of thromboembolism

20   in a person who was cast, had his foot cast in

21   the equinus position, as opposed to a person

22   having a plaster -- was it a plaster of paris

Page 65

1    cast?

2         A.    Cast or splint.

3         Q.    Yes, sir.  Do you use plaster of

4    paris in the group?

5         A.    We do.  I believe but I do not

6    specifically recollect that his splint would

7    have been plaster and his cast would have been

8    fiberglass.

9         Q.    I am going to start over.  It has

10   become too complicated.

11               Did you believe, at the time that

12   you attended to him on January 15th, that the

13   incidence of thromboembolism was the same in a

14   person who had a splint such as the one he had

15   between the 10th and the 15th, and a person

16   who is put into a cast?

17        A.    I think there may be some bias

18   with regards to trying to look at that

19   specific issue because people get splints and

20   casts for different reasons.  But all other

21   things being equal, I would say that, to my

22   knowledge, the risks are basically identical.

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

Page 66

1          Q.    That was your belief?

2          A.    Yes, sir.

3          Q.    I don't want to mischaracterize

4     what you say, but I think you meant to say

5     that there is confounding factors involved

6     because people are put in casts for different

7     reasons in the lower extremities.  Is that

8     correct?  And this would confound the results

9     of any studies as to whether or not

10    thromboembolism was more prevalent with one

11    treatment modality than the other.  Is that

12    correct?

13         A.    I believe that's accurate, yes.

14         Q.    At this time you released him.

15    When is the next time you saw him?  Let's go

16    to the next page.  Any writing yours on this

17    particular page?

18         A.    I believe it is all my writing.

19         Q.    It says, to PT from ortho,

20    January 15th, 2003.  Correct?

21         A.    Yes, sir.

22         Q.    What does that say, sir?

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1          A.     It says 62 year old with left

2     Achilles rupture.  Needs new crutches.

3               Under provisional diagnosis, it

4     says left Achilles rupture.  And then my

5     signature is under doctor's signature.  And

6     his name, and family member prefix, and Social

7     Security Number at the bottom.

8          Q.     What does family member prefix

9     mean?

10          A.     It is a military bookkeeping

11     number for whether or not you are the sponsor,

12     meaning the active duty person, yourself,

13     versus a spouse, a second spouse or a child,

14     or a grandparent, for that matter.

15          Q.     Let's go to the next page, sir.

16               Page five.  I have numbered it.

17     Can we agree that these pages are identical?

18          A.     They appear to be, sir.

19          Q.     Do you have any writing, any of

20     your writing appear on this particular page?

21          A.     I do not believe so.

22          Q.     What is this document, if you

1    know?

2         A.    It is a note from Mr. Burton's

3    follow-up clinic visit from me.  It looks like

4    on the 7th of February, 2003.

5         Q.    February 7, 2003.  And it has

6    1300.  I assume that is the time?

7         A.    Yes, sir.

8         Q.    That would be 1:00 o'clock, I

9    believe, in civilian time, 1:00 p.m.?

10        A.    That's correct.

11        Q.    And it says, code BPAP wound.

12   What does that mean, sir?

13        A.    I have no idea, sir.

14        Q.    Do you know whose writing this is

15   on this page?

16        A.    I believe that was a Dr. Mase,

17   M A S E.

18        Q.    Who is Dr. Mase?

19        A.    He was a general surgery intern

20   that was, as part of his rotating

21   internship --

22        Q.    So he --

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1        A.    -- working with orthopedics.

2        Q.    I am sorry, please forgive me.  I

3   interrupted you.

4        A.    I said, as part of his general

5   surgery internship, he was rotating to

6   orthopedics and working with us.

7        Q.    Was he a first year intern or

8   second year intern?

9        A.    Being an intern implies that you

10  are a first year.  He was a first year.

11       Q.    Forgive me for jumping around.  I

12  wanted to make sure that, at the completion of

13  the January 15th visit, did you give him any

14  instructions with respect to the signs and

15  symptoms -- strike that -- did you give him

16  any written instructions concerning the signs

17  and symptoms of a pulmonary embolism?

18       A.    Not that I recall.

19       Q.    Did you give him any instructions

20  with respect to the signs and symptoms of a

21  deep vein thrombosis?

22       A.    I may have reasked the verbal

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

Page 70

1    instructions that we had already given him in

2    the emergency room but I did not give him any

3    written instructions to that effect.

4        Q.    Do you have any specific recall of

5    giving him any verbal instructions regarding

6    the signs and symptoms of deep vein thrombosis

7    on January 15th at the completion of your

8    visit with him?

9        A.    I do not specifically recall.

10       Q.    Do you specifically recall giving

11   his wife any instructions with respect to the

12   signs and symptoms of deep vein thrombosis?

13       A.    No, sir.

14       Q.    Do you recall giving his wife

15   instructions regarding the signs and symptoms

16   of pulmonary embolism?

17       A.    (Pause.)

18       Q.    On January 15th at the completion

19   of his visit with you, and the placement in a

20   cast?

21       A.    Not that I recall, sir.

22       Q.    Dr. Mase, M A S E?

Page 71

1    A.    That's correct.

2    Q.    Do you know where Dr. Mase is now?

3    A.    No, sir, I do not.

4    Q.    He was a surgical resident?

5    A.    A surgical intern.

6    Q.    That means he had been out of

7    medical school how long when he saw Captain

8    Burton?

9    A.    Depending on when he graduated,

10    roughly, just under a year.

11    Q.    So he would have been a first year

12    intern, surgical intern?

13    A.    Yes, sir.

14    Q.    Were you present with him when he

15    evaluated Captain Burton on the 7th of

16    February?

17    A.    Yes, sir.

18    Q.    And did you, in fact, sign off on

19    his notes?

20    A.    He has documented here that the

21    patient was seen with Potter.  But I do not

22    see my physical signature on the sheet.

Page 72

1          Q.    Do you, as you sit here today,

2     sir, do you have recall of this particular

3     visit?

4          A.    I remember seeing -- I remember

5     the act of seeing Captain Burton all three

6     times that I saw him.  So, yes.

7          Q.    Are you able to read the note?

8     You were present, and this appears to be a

9     SOAP note, as well.  Correct?

10         A.    Yes, sir.

11         Q.    Tell me, what does this note show?

12    What does it show?  If you can read it, fine.

13    If you can tell me what you believe the

14    essence was and what impression it left on you

15    at the time, you can do that, as well.

16         A.    I can probably read most of it.

17         Q.    Would you please, sir?

18         A.    62 year old status post ruptured

19    left Achilles tendon on 10 January.  Now in

20    short leg cast times four weeks.  Here for

21    follow-up.  Pain improving.  Patient states

22    increased swelling at night.

Page 73

1          Under the objective, it says left

2  lower extremity nontender to palpation.  Two

3  plus peri-ankle, P E R I dash ankle,

4  nonpitting edema.  Neurovascularly intact.

5          Under assessment, it says left

6  ruptured Achilles tendon with conservative

7  treatment.  Under plan, new cast with

8  approximately 10 degrees more dorsiflexion.

9  Nonweightbearing times two weeks.  Follow up

10 in two weeks.  Seen with Potter, and then his

11 signature.

12      Q.    Sir, getting to the SOAP note,

13 subjective, objective, assessment and plan,

14 right?

15      A.    Yes, sir.

16      Q.    Under the objective portion of

17 your note, you state that he has nonpitting

18 edema of ankle.

19      A.    Yes, sir.

20      Q.    Wasn't his ankle in a cast?

21      A.    The purpose of this visit was for

22 a cast change so the exam would have been

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

Page 74

1    performed when the cast was off.

2         Q.    So were you present when the cast

3    was taken off?

4         A.    I believe so, sir.

5         Q.    And you are the person who used

6    the cast cutters in order to remove the old

7    cast?

8         A.    I have used them in the past but

9    we have cast techs who do that for a living.

10              (Discussion off the record.)

11              THE WITNESS:  I was probably not

12   the person who removed and replaced his cast.

13              BY MR. EATON:

14        Q.    Once the cast was removed you saw

15   edema which you believe to be nonpitting.  Is

16   that correct?

17        A.    That's correct.

18        Q.    Would you explain to us what the

19   difference is between pitting and nonpitting

20   edema?

21        A.    Pitting edema means that when you

22   press on the patient's skin at the site of the

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1    swelling you are able to leave a mark or a

2    dimple, almost like a thumb print.  Nonpitting

3    edema, that doesn't occur.  There is no mark

4    left when you remove your finger.

5           Q.    If there were another definition

6    of pitting edema, then you wouldn't be in a

7    position to determine whether or not he had

8    it.  Correct?

9           A.    (Pause.)

10           Q.    Just say, for example,

11    hypothetically, you had given me the

12    definition of capillary refill.  Having that

13    in mind, would it be fair to say that at that

14    time he was evaluated for capillary refill,

15    not pitting edema?

16           A.    No, it would not be fair to say.

17           Q.    But it is your understanding that

18    pitting edema was involved when you mashed and

19    it took a period of time for the color to be

20    restored in the area?

21           MR. RANIERI:  Objection to the

22    characterization of his testimony.

1          BY MR. EATON:

2          Q.    Is that correct?

3          A.    Pitting edema is when it takes the

4     amount of time for the contour of the skin.

5     You are not necessarily looking at color, or

6     blanching, or capillary refill, as you put it.

7     You are looking at whether or not the skin is

8     supple and rebounds normally or whether or not

9     your finger leaves a mark, a pit, if you will.

10          Q.    You said he had two plus

11     peri-ankle edema.  What does that mean, sir?

12          A.    Two plus is on a zero to four plus

13     scale.  So this would be mild to moderate

14     swelling.  Peri-ankle means the swelling was

15     about his ankle, which is consistent with the

16     site of his Achilles tendon rupture.

17          Q.    As a result of your examination of

18     him you decided to put a different cast on him

19     with more dorsiflexion.  Correct?

20          A.    That's correct.

21          Q.    Explain to me what dorsiflexion

22     means.

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1      A.    It is the motion that you make

2  with your ankles, basically the opposite of

3  trying to point your toes.  So bringing your

4  ankle back up.

5      Q.    Towards your head?

6      A.    Yes, sir.

7      Q.    Why did you do that?

8      A.    As part of his nonoperative

9  treatment for an Achilles tendon rupture, you

10  initially immobilize the patient in the

11  resting position of gravity equinus.  As the

12  tendon starts to heal you gradually, through

13  successive casts and, eventually, a removable

14  cast brace, bring them back up so their ankle

15  is more dorsiflexed or their toes are closer

16  to their head to get them back into a normal

17  position.

18      Q.    Under the plan, you said you give

19  him two more degrees.  I am sorry, is that ten

20  more degrees?

21      A.    I believe it says ten more

22  degrees.

1      Q.    Ten more degrees of dorsiflexion,

2   and you again instruct him to be

3   nonweightbearing for two weeks.  Correct?

4      A.    Nonweightbearing on his left lower

5   extremity.  That's correct.

6      Q.    Of course, the return in two

7   weeks, by the time of two weeks he was dead.

8   Right?

9      A.    I am not sure of the specific date

10  of Mr. Burton's demise.

11     Q.    Let's go to page six.  Do you have

12  any writing on this particular page?

13     A.    (Pause.)

14     Q.    You want to make sure that page

15  six is the same as you have there.

16     A.    No, I don't have any writing on

17  the page.

18     Q.    This is what is called a hospital

19  summary.  Is that correct?

20     A.    Yes, sir.  It is right there.

21     Q.    And this is from the year 1997.

22  Correct?

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1        A.    Yes, sir.

2        Q.    During any time when you were

3   treating him did you, in fact, review this

4   particular page?

5        A.    Not that I can recall.

6        Q.    Was it available to you or could

7   you have requested his prior medical records

8   had you chosen to do so?

9        A.    I could have specifically asked

10  the patient to retrieve them.  I don't recall

11  whether or not that was done.  Frequently,

12  after making such requests, patients would

13  show up without them anyway.  But I could have

14  asked for them, yes.

15       Q.    Was this record in the possession

16  of Walter Reed Hospital at the time he was

17  treated?

18       A.    I don't know, sir.

19       Q.    Did you question him about his

20  history, whether or not he had ever been

21  suspected of having a deep vein thrombosis?

22       A.    (Pause.)

1        Q.    Prior to your treating him?

2        A.    Not specifically that I can

3    recall.

4        Q.    Would you help me, sir?  It

5    describes, does it not, right lower extremity

6    swelling.  This is dated August 7 -- I am

7    sorry, 7 August, '97.  And this was at the

8    naval air station.  Is that Alameda?

9        A.    I am not sure but it does say

10   naval air station.

11       Q.    Are you aware of the history that

12   he had just flown cross country when he got to

13   this particular place?

14            MR. RANIERI:  Objection.  Assumes

15   facts not in evidence.

16            You can answer the question.

17            THE WITNESS:  According to the

18   note not written by me on the next page, it

19   says he had a history of traveling on a plane

20   trip ten days ago.

21            BY MR. EATON:

22       Q.    And isn't it a fact that it was

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1    known as of the year 2003 that long plane

2    trips can cause stasis?

3         A.    Yes, sir.

4         Q.    And stasis, of course, can lead to

5    deep vein thrombosis?  Are you aware of that?

6         A.    I believe that's correct, yes.

7         Q.    I am not going to question you

8    anymore about the records that you didn't --

9              You testified earlier -- and I am

10   recharacterizing some of your testimony, so I

11   want you to make sure I am right here, sir.

12   This was an ultrasound that was done at that

13   time.  Is that correct?

14        A.    Which sheet are you looking at?

15        Q.    I am looking at page eight, now.

16   Let's make sure we got the right one.

17              This is a radiologic examination.

18        A.    This looks like a report from the

19   ultrasound of the right leg.

20        Q.    And this is a duplex sonogram of

21   his right leg.  Correct?

22        A.    I believe that's correct.

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

Page 82

1     Q.    And where did the thromboembolism

2    that he -- which leg did he rupture?  Which

3    Achilles tendon did he rupture?  The left or

4    the right?

5     A.    I believe he ruptured his left

6    Achilles tendon.

7     Q.    And this one was in his right leg?

8     A.    The ultrasound was performed on

9    his right leg.

10    Q.    Do you expect to testify at trial

11   in this matter?

12        MR. RANIERI:  Objection.

13        BY MR. EATON:

14    Q.    If it goes to trial?

15        MR. RANIERI:  Objection.  Calls

16   for the witness to testify to a legal strategy

17   that defendant has that will remain privileged

18   as to how we defend the case.

19        MR. EATON:  Are you instructing

20   him not to answer?

21        MR. RANIERI:  Yes.

22        MR. EATON:  I will terminate the

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1    deposition, then.  We will reconvene at a time

2    after the court has ruled upon your

3    instruction.

4              MR. RANIERI:  If we can go off the

5    record, maybe you can explain where you are

6    going with this.  I don't have any problem

7    talking to the court, calling the duty judge,

8    or finding out --

9              MR. EATON:  I want to call the

10   judge to which it is assigned.  But I am not

11   going to call him.  We can go before him on a

12   proper motion under Rule 37.

13             MR. RANIERI:  I think before we

14   have a discovery dispute that you wish to

15   bring to the judge, even one that deals with

16   privilege asserted at a deposition, you

17   probably ought to, at least, tell me what you

18   are going to talk about.

19             MR. EATON:  I am not going to tell

20   you what I am looking for.  I don't have to.

21   It doesn't even have to be relevant at this

22   point or admissible.  What it boils down to,

1    as long as it may lead to the admission of

2    relevant evidence, for example, such as you

3    are going to call him as an expert witness, I

4    have a right to know.  And I have the right to

5    know the opinions he has.  I asked him did he

6    expect to testify at trial, which is a

7    completely appropriate question.

8            MR. RANIERI:  All I wanted to do

9    is have this discussion, and off the record,

10   so I can decide whether that was a proper

11   exercise of our privilege.  I don't want to

12   call on judges based on reactionary moves by

13   counsel.  I am happy to have a discussion with

14   you so we can talk through these discussions.

15           MR. EATON:  Fair enough.

16           MR. RANIERI:  I think you can

17   answer whether you believe, at this point, you

18   will be testifying at trial.  Whether you know

19   that or not.  You can answer that question.

20           THE WITNESS:  Sir, I believe that

21   if this case goes to trial I would be called

22   as a witness and required to testify, yes.

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1    BY MR. EATON:

2        Q.    And that was my only question was,

3    as you sit here today, do you expect to give

4    expert testimony?  Because this will affect

5    the further questioning of you at this time.

6            MR. RANIERI:  I will object.  That

7    wasn't your question.  The way you asked this

8    question was not a proper restatement of the

9    way you asked your first question.

10            If you would like to ask whether

11   this witness believes he will be an expert or

12   not, you can ask that question.

13            MR. EATON:  I think that is what I

14   just asked.  Read it back for me.

15            (The pending question was read by

16   the reporter.)

17            MR. RANIERI:  You can answer that

18   question.

19            THE WITNESS:  If I am called to

20   testify in this case at trial, I do not

21   anticipate being an expert witness.

22            MR. EATON:  Let's go off the

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1    record for just a moment.  Let me review my

2    notes.

3              (A recess was taken.)

4              BY MR. EATON:

5         Q.    Captain Potter, I just have two

6    final series of questions.

7              First of all, will you be giving

8    any testimony concerning the cause of Captain

9    Potter's death?

10        A.    Captain Burton?  Sorry.

11        Q.    Captain Burton's death.

12             (Discussion off the record.)

13             MR. EATON:  The question is will I

14   be giving testimony concerning the cause of

15   Captain Burton's death?

16             BY MR. EATON:

17        Q.    Captain Burton's death.

18        A.    Not to my knowledge, sir.

19        Q.    Have you reviewed any of the

20   autopsy, any other documents concerning his

21   death?

22        A.    I think I have read some of your

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1    findings and motions but I have not read the

2    autopsy report, specifically, sir.

3         Q.    Tell me, sir, where did you learn

4    about deep vein thrombosis?

5         A.    In medical school, sir.

6         Q.    Do you own any orthopedic texts?

7         A.    Yes, sir.

8         Q.    Which ones do you own?

9         A.    Several.  I own Campbell's

10   Operative Orthopedics.  Rockwood and Green's

11   Fractures in Adults.  Rockwood and Wilkins'

12   Fractures in Children.  Several Orthopedic

13   Knowledge Update books.

14        Q.    Such as?

15        A.    They are numbered.  Six, seven,

16   eight, I think are the ones I have.  The

17   numbers get higher each update.

18        Q.    These updates are published by

19   whom?  Do you know?

20        A.    It is published out of -- it is

21   published by the American Academy of

22   Orthopedic Surgeons west of Chicago.

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1        Q.     Are you familiar with any

2    guidelines published by the American College

3    of Orthopedics concerning the treatment of

4    Achilles, ruptured Achilles tendon?

5        A.     Of any specific guidelines

6    published by the American?

7        Q.     I think it is American College --

8        A.     Association of Orthopedic

9    Surgeons?

10       Q.     Yes.

11       A.     Not that I can specifically

12   recall, sir.

13       Q.     Do you belong to the American

14   Association of Orthopedic Surgeons?

15       A.     I am a resident member.

16       Q.     After you are board certified, you

17   become a full member?

18       A.     Yes, sir.

19       Q.     We can agree, can we not, that

20   this is an organization dedicated in part to

21   promoting safety in the practice of orthopedic

22   surgery?

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1          A.    I believe that's true, sir.

2          Q.    Do you consider their publications

3    generally to be authoritative?

4          A.    I would say that they are

5    generally a reliable consensus statement.

6          Q.    Do you consider Campbell's

7    Orthopedics to be a generally reliable

8    authority?

9          A.    Yes, sir.

10         Q.    How about Rockwood and Green,

11   Fractures in Adults?

12         A.    Yes, sir.

13         Q.    And Rockwood and Green, Fractures

14   in Children?

15         A.    That is Rockwood and Wilkins.

16         Q.    Rockwood and Wilkins?

17         A.    Maybe even a third guy, now.

18   Fractures in Children.  But yes.

19         Q.    One last question.  At what

20   point -- let's just say that the risk of

21   thromboembolism was two percent.  Would this

22   be of such a magnitude that you would feel

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1    compelled to advise a patient of the risk of

2    such an occurrence?

3        A.    I would say that I routinely

4    counsel patients like Captain Burton of the

5    risks, signs and symptoms of venous thrombosis

6    and thromboembolism when the risks are less

7    than two percent.  So yes.

8        Q.    Is there a threshold below which

9    you would not advise patients of the risk of

10   the occurrence of an event?  Let's say the

11   incidence.  When I am speaking of threshold, I

12   am speaking of incidence.

13       A.    I can't think of a specific

14   threshold, no.  If that is a reported

15   complication of a specific procedure that I am

16   performing on a patient, or an injury that I

17   am treating a patient for, I would always at

18   least mention it.

19       Q.    For example, in your practice, you

20   often have to operate on long bones.  Correct?

21       A.    Yes, sir.

22       Q.    And especially when you are

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

Page 91

1    talking of bones such as the femur, there is

2    the increased risk of fat embolism which can

3    be fatal.  Correct?

4          A.    Yes.

5          Q.    What I am saying, I don't know the

6    risk, the incidence of fat embolism if you

7    operate on long bones, but I am trying to say,

8    let's say that it was one in a thousand.

9    Would you feel compelled to tell the patient

10   of the risk that it was one in a thousand?

11         A.    If it was one in a thousand I

12   might not be compelled to mention fat embolism

13   specifically, but certainly, for even a simple

14   knee scope, we counsel patients that the risks

15   of the procedure and anesthesia are up to and

16   including death.

17         Q.    If, in fact, the risks were one in

18   a hundred, would you feel compelled to tell

19   the patient about this risk before the patient

20   made a decision about his treatment modality

21   that we are going to have?

22         A.    It is hard for me to give a

Page 92

1    specific threshold but, for one in a hundred,

2    yes, probably.

3              MR. EATON:  Thank you for your

4    time, sir.  I have no further questions.

5              Your counsel may wish to advise

6    you concerning your right concerning the

7    reading and signing of this deposition.

8              MR. RANIERI:  Before doing that,

9    we would like to say, we don't have any

10   further questions.  We do advise Captain

11   Burton that we do want to read -- I am sorry,

12   Captain Potter -- that you do read and sign

13   your deposition.

14              (Discussion off the record.)

15              THE WITNESS:  I would like to read

16   and sign.

17              MR. EATON:  I would also like to

18   thank our Walter Reed hosts for their kindness

19   to us.

20              (Whereupon, at 3:41 p.m., the

21   deposition was concluded.)

22                    + + +

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

Page 93

1      CERTIFICATE FOR READING AND SIGNING

2

3          I hereby certify that I have read

4   and examined the within transcript and the

5   same is a true and accurate record of the

6   testimony given by me.

7          Any corrections I have listed on

8   the separate errata sheet enclosed, indicating

9   the page and line number of each correction.

10

11

12

13

13      _____

14      Benjamin Potter, M.D.

14

15

15      _____

16      Date

17

18

19

20

21

22

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac

1      CERTIFICATE OF NOTARY PUBLIC

2              I, Zev V. Feder, the officer

3    before whom the foregoing deposition was

4    taken, do hereby certify that the witness,

5    whose testimony appears in the foregoing

6    deposition, was duly sworn by me; that the

7    testimony of said witness was taken by me in

8    shorthand and thereafter reduced to computer

9    type under my direction; that said deposition

10   is a true record of the testimony given by

11   said witness; that I am neither counsel for,

12   related to, nor employed by any of the parties

13   to which this deposition was taken; and

14   further, that I am not a relative or employee

15   of any attorney or counsel employed by the

16   parties hereto, nor financially or otherwise

17   interested in the outcome of the action.

18

19                     _____

19                     Notary Public in and for

20                     the District of Columbia

21   My Commission Expires:

21   April 14, 2007

22

Feder Reporting Company
(202) 863-0000

547b0db5-ffcf-4ca1-a045-48c7f3cb2aac