# Yale University Health Services

Paul Gcnecin, M.D.
Director
17 Hillhouse Avenue
P.O. Box 208237
New Haven, Connecticut 06520-8237

August 7, 2006

Allen T. Eaton, Esquire
Eaton Law Firm, PLLC
1111 14th Street NW
Washington, DC 20005-5603

Re: Samuel Burton v. Walter Reed Army Medical Center

Dear Mr. Eaton:

I write to summarize my fmdings pertaining to the care rendered to Samuel Burton (January 7, 1941 - February 20,2003), with specific focus on the care Mr. Burton received at the Walter Reed Medical Army Medical Center (WRAMC) on January 10, 2003, January 15,2003 and February 7,2003. The following materials were provided for this review:

- Photocopy of Claim for Damage, Injury or Death, dated 12/27/04;
- Death Certificate dated February 21, 2003;
- Excerpts from record of care rendered to Samuel Burton in August 1997;
- Medical Records from WRAMC - January 10 - February 7,2003;
- Maryland Ambulance Information System record dated February 20,2003;
- Post Mortem Examination Report dated April 3, 2003;
- Correspondence between Doshia Daniels Burton *(3/5103)* and William C. Doukas, MD (4/22/03).

In January 2003, Samuel Burton was a 62-year-old retired Coast Guard officer who enjoyed good health apart from treated hypertension. In 1997 he was evaluated and followed for right lower extremity swelling of a week's duration, for which he underwent venous duplex ultrasound (negative for clot in the popliteal and iliofemoral veins) and was treated with Aspirin.

Mr. Burton ruptured his left Achilles tendon on January 10, 2003 while playing basketball. He was treated at WRAMC by Dr. Benjamin Potter, who provided analgesic medication and a splint and recommended follow up in Orthopedics Clinic. Mr. Burton

Telephone (203) 432-0076                                                    Fax (203) 432-7289

saw Dr. Potter in follow up on January 15, 2003, at which time he had "moderately increased swelling." Mr. Burton elected closed treatment of his Achilles tendon rupture rather than surgical repair. He was placed in a cast and advised to elevate his injured leg. At his one-month follow-up visit to Dr. Potter in the WRAMC Orthopedics Clinic on February 7, 2003, Mr. Burton complained of "[upward arrow signifying 'increased' or 'increasing'] swelling at night." Examination revealed that his left lower extremity was nontender to palpation but that he had "2+ peri-ankle non-pitting edema". He was provided a new cast with increased dorsiflexion and advised to continue "non weight bearing x 2 weeks."

On February 20, 2003, Samuel Burton died suddenly and Maryland Ambulance emergency medical technicians were unable to resuscitate him. On post mortem examination, Mr. Burton had "pulmonary thromboembolism secondary to left leg deep vein thrombosis complicating a tendon injury." The medical examiner went on to state in his opinion, that "pulmonary thromboembolisms are documemed complications of the immobility that is associated with extremity injury and the convalescent period..."

On March 5, 2003, a few weeks after Mr. Burton's death, his wife wrote to the "Head of Orthopedics" at WRAMC and described Mr. Burton's concern about his lower extremity swelling, including the complaint he articulated to Dr. Potter on February 7, 2003. She went on to describe Mr. Burton's episodes of acute dsypnea starting on February 8, some of which were associated with chest pain. Mrs. Burton pointed out that she and her husband were not forewarned about signs that might point to complications when patients are given casts. **In** his reply to Mrs. Burton, Dr. William Doukas stated that "your husband was considered to be at low risk for pulmonary embolism because he was in generally **good** health." He added that "as a result of your letter, we are reexamining our counseling process to insure [sic] that patients are receiving the best possible counseling on the risk and benefits of all treatment choices."

*     *     *

I focus my review on Dr. Benjamin Potter's approach to Samuel Burton's risk of venous thromboembolism and symptoms of the same. I state all of my opinions with reasonable medical certainty.

· Although anticoagulation to prophylax against DVT and pulmonary embolus (PE) is not generally recommended for patients with below-the-knee injuries such as fracture and Achilles tendon rupture, older patients, patients with prior history of DVT and patients who require leg immobilization are at increased risk of DVT.
   o It is unknown whether Mr. Burton had a below-the-knee DVT in 1997, but that episode of leg swelling should have alerted Dr. Potter to possible

- heightened risk and it should have lowered his threshold to consider DVT prophylaxis and present it as an option to Mr. Burton.
- The medical standard requires that the treating physician educate patients requiring leg immobilization about the symptoms of DVT and pulmonary embolism (PE).
    - *a* There is no evidence that Mr. Burton was provided with information and warning about the symptoms and signs of DVT and PE.
- Prior to his Achilles tendon rupture, Mr. Burton may have been at low risk for DVT because of his generally good health and high activity level. However, his risk of DVT increased sharply when he became immobilized because of Achilles tendon rupture.
    - *a* The increased risk of venous thromboembolic disease in patients immobilized by lower extremity injury means that patients with symptoms such as persistent leg swelling must be evaluated for possible DVT. The fact that lower extremity injury may be associated with swelling underscores the importance of work up to distinguish expectable swelling from DVT.
    - *a* It was a deviation from the generally accepted standard to fail to evaluate Mr. Burton for DVT at least on February 7, 2003. The fact that Mr. Burton had ongoing, uncomfortable lower extremity swelling at a month after his injury should have greatly increased Dr. Potter's suspicion of DVT and prompted appropriate work up.
    - *a* Because of Mr. Burton's equivocal history of possible DVT in 1997, his physician should have been especially scrupulous in evaluating any symptoms suggestive of DVT.
- With reasonable medical certainty, Samuel Burton's death was caused by medical negligence on the part of his treating physician, Dr. Benjamin Potter.
    - *a* With reasonable certainty, Mr. Burton's death would have been prevented if his DVT had been diagnosed and treated when he presented with ongoing lower extremity swelling on February 7, 2003.
    - *a* If Mr. Burton had been informed of his risk of DVT and PE, he could have looked out for symptoms and reported them in time to avoid massive PE.
    - *a* More likely than not, his death would have been preventable as late as the day of his demise if he had been educated to seek evaluation and treatment for symptoms compatible with DVT and PE.

In summary, Samuel Burton was a healthy 62-year-old man who ruptured his Achilles tendon while playing basketball in January 2003. Failure to recognize Mr. Burton's heightened risk for venous thromboembolism and failure to evaluate his symptom of lower extremity swelling resulted in failure to diagnose DVT at a stage when it was eminently treatable. More likely than not, treatment including anticoagulation would have prevented Mr. Burton's death from massive PE. Moreover, failure to educate Mr. Burton about his increased DVT risk and failure to inform him of signs and symptoms of DVT and PE contributed to his death. If Mr. Burton had known that

Samuel E. Burton v. Walter Reed Army Medical Center - case summary and review
Paul Genecin, M.D., F.A.C.P.
August 7, 2006

increased or increasing lower extremity swelling, chest pain and shortness of breath could have been symptoms of a medical emergency, he would have known to seek timely treatment - and with reasonable medical certainty, his death from massive **PE** could have been prevented.

      Please let me know if you require additional information or clarification of my opmlons.

Sincerely yours,

Pau Genecin,
.D., F.A.C.P.

Samuel E. Burton v. Walter Reed Army Medical Center - case summary and review
Paul Genecin, M.D., F.A.C.P.
August 7, 2006