UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


DOSHIA DANIELS BURTON,      :
et al.,                     :
                            :
            Plaintiffs      :
                            : Civil Action No.
     vs.                    : 05-2214 (JGP)
                            :
UNITED STATES OF AMERICA:
                            :
            Defendant       :


                Washington, D.C.
                September 29, 2006

Deposition of:


     BENJAMIN POTTER, M.D.,
called for oral examination by counsel for
Plaintiffs, pursuant to notice, at the Walter
Reed Army Medical Center, Building 2, Command
Suite, Washington, D.C., before Zev V. Feder,
CSR, a Notary Public in and for the District
of Columbia, beginning at 2:05 p.m., when were
present on behalf of the respective parties:

Page 2

```
 1  On behalf of the Plaintiffs:
 2
 2  BY: ALLEN T. EATON, III, ESQ.
 3      THE EATON LAW FIRM, PLLC
 3      1111 14th Street, N.W., Suite 777
 4      Washington, D.C. 20005
 4      (202)789-0088
 5
 5  On behalf of the Defendant:
 6
 6  BY: STEVEN RANIERI, ESQ.
 7      Special Assistant U.S. Attorney
 7      District of Columbia
 8      555 4th Street, N.W., Room 44408
 8      Washington, D.C. 20530
 9      (202) 353-9895
10      and
11  BY: CAPT. KELLY T. DAVISON, ESQ.
11      U.S. Army Legal Services Agency
12      Torts Branch
12      901 North Stuart Street, Suite 431
13      Arlington, Virginia 2223-1837
13      (703) 696-1638
14
15  Also Present: DANIEL L. WINAND, ESQ.
15      Walter Reed Army Medical Center
16
17           + + +
18
19
20
21
22
              Feder Reporting Company
                (202) 863-0000
```

Page 3

```
 1
 2            C O N T E N T S
 3  WITNESS: BENJAMIN POTTER, M.D.
 3
 4  EXAMINATION BY:            PAGE:
 5    MR. EATON                  4
 6    MR. RANIERI                -
 7
 8            E X H I B I T S
 9  DEPOSITION NO.    MARKED FOR IDENTIFICATION
10   1  Curriculum vitae        4
11   2  Medical records         8
12   3  Medical records         9
13
...
22
              Feder Reporting Company
                (202) 863-0000
```

Page 4

```
 1
 2  Thereupon,
 3           BENJAMIN POTTER, M.D.,
 4  was called for examination by counsel and,
 5  after having been duly sworn by the Notary,
 6  was examined and testified as follows:
 7  EXAMINATION BY COUNSEL FOR PLAINTIFFS
 8       BY MR. EATON:
 9       Q.   Would you please state your full
10  name for the record?
11       A.   Benjamin Kyle Potter.
12       Q.   Your address is Walter Reed
13  Hospital?
14       A.   My business address, yes.
15       Q.   You provided me with your
16  curriculum vitae. I am just going to
17  summarize a little bit for the record. I am
18  going to have this curriculum vitae marked as
19  Exhibit Number 1.
20           (Document referred to marked
21  Deposition Exhibit No. 1 for identification
22  and subsequently attached to the deposition.).
              Feder Reporting Company
                (202) 863-0000
```

Page 5

```
 1       BY MR. EATON:
 2       Q.   You are a graduate of the United
 3  States Military Academy?
 4       A.   Yes, sir.
 5       Q.   And you received your Doctor of
 6  Medicine from University of Chicago. Your
 7  residency in orthopedic surgery, and
 8  orthopedic surgery internship all here at
 9  Walter Reed. Is that correct?
10       A.   Yes, sir.
11       Q.   And your present duties are what,
12  sir?
13       A.   I am currently a chief resident in
14  orthopedic surgery at Walter Reed.
15       Q.   I know you have heard all the
16  stories about these horrible lawyers who come
17  in and want to embarrass you and try to trick
18  you full of tricky questions, this type of
19  thing. If you have those expectations, you
20  are going to be disappointed, because I am
21  going to treat you with respect; in fact, even
22  deference. It is going to be a very limited
              Feder Reporting Company
                (202) 863-0000
```

Page 18

BY MR. EATON:

Q. First of all, remember, I warned you about mischaracterization. If I mischaracterize your testimony, please correct me. You are not going to hurt my feelings.

A. **I will state that I believe Mr. Burton's only risk factor was that he had an Achilles tendon rupture being treated in a splint and then a short leg cast. In the absence of additional risk factors, he would certainly not be counseled as to what risk factors were but, rather, just the signs and symptoms of deep venous thrombosis or pulmonary embolism.**

Q. When you say the fact that he had his leg -- first of all, you put him in a splint. Is that correct?

A. Yes.

Q. And he was put in an equinine?

A. Equinus.

Q. Equinus position? That's horse, right?

Feder Reporting Company
(202) 863-0000

Page 19

A. Yes.

Q. When you put it in that position he wasn't in a cast, right?

A. **He was initially in a splint.**

Q. I just want to make sure, the fact that his foot was immobilized, do you think that was the only risk factor that he had?

A. **His foot was immobilized for treatment of his Achilles tendon rupture, that's correct.**

Q. Was the fact that he was told not to be weightbearing and that he was in bed for a period of time, and his wife was waiting on him hand and foot, would that be an additional risk factor?

MR. RANIERI: Objection. Assumes facts not in evidence.

Please answer.

THE WITNESS: He was instructed to remain nonweightbearing in his splint and, later, his cast, and to ambulate with crutches, and to keep his lower extremity

Feder Reporting Company
(202) 863-0000

Page 20

elevated whenever not actively ambulating. But he was never instructed that he could not ambulate with crutches and he was given crutches specifically for that reason. So he was not, at least pursuant to any of my medical instructions, on bed rest or to be waited on hand and foot.

BY MR. EATON:

Q. So it is your opinion, then, that he could have, in fact, walked around -- not walked but he could have ambulated with crutches and he was not to be bedridden for the period of time?

A. **That's correct.**

Q. The fact that he was bedridden, would that have been a risk factor for him?

A. **If he was completely, yes, if he was bedridden, that would be a risk factor.**

Q. Did you ever instruct him that he should not be bedridden?

A. **I was never aware that he was bedridden so, no, I did not instruct him**

Feder Reporting Company
(202) 863-0000

Page 21

specifically not to be.

Q. Your testimony is, the only risk factor that he had was the fact that his leg was immobilized -- first of all, in a splint? The splint, was that a risk factor, while he was immobilized in a splint?

A. **Yes, sir.**

Q. Was it a risk factor while he was immobilized in a cast?

A. **Yes, sir.**

Q. And those are the only risk factors of which you were aware at the time you were treating him back in year 2003, right?

A. **That he was being treated in a cast -- immobilized in a cast and splint for treatment of his Achilles tendon rupture would be his only risk factor, yes.**

Q. Did you review his records prior to the time -- at or about the time you treated him?

A. **I do not recall specifically but I**

Feder Reporting Company
(202) 863-0000

Page 24

 1  am not sure that they were ever made available
 2  to me.
 3      Q.  Did you ever request them?
 4      A.  I don't recall, sir.
 5      Q.  Would the fact, if it were known
 6  to you, that he had had an incident in which
 7  it was suspected that he had a deep vein
 8  thrombosis, what if anything would you have
 9  done had you known that?
10          MR. RANIERI: Objection. Assumes
11  facts not in evidence.
12          Please continue.
13          THE WITNESS: I would have
14  examined the incident and, depending on what
15  that showed, possibly taken different action,
16  or at least more specific in my counseling.
17  However, in reviewing the patient's medical
18  record, it appears that when he had had prior
19  ultrasounds to evaluate him for deep venous
20  thrombosis, of which I was not aware, the
21  studies were negative. So in the absence of a
22  clinically proven deep vein thrombosis, having

Feder Reporting Company
(202) 863-0000

Page 23

 1  these negative ultrasounds in his past might
 2  actually lower one's index of suspicion for
 3  him having a clot at this point.
 4          BY MR. EATON:
 5      Q.  Explain that to me, why the fact
 6  that it had been evaluated in the past, after
 7  a cross-country trip, explain to me how in
 8  your opinion, sir, that that would lower the
 9  probability that he had a deep vein thrombosis
10  in January, 2003?
11      A.  I did not state it would lower his
12  probability. But, clinically, the fact that
13  he had had a negative study is not going to do
14  anything to make him more predisposed to have
15  a clot.
16      Q.  Since the year 2003 has Walter
17  Reed published guidelines setting forth the
18  risk factors and the precautions to be taken
19  with persons whose lower extremities are being
20  immobilized for a period of more than a week?
21      A.  Our medical practice and how we
22  approach and treat patients has not changed

Feder Reporting Company
(202) 863-0000

Page 24

 1  but we have formalized a cast care instruction
 2  sheet in order to document for the record that
 3  all those items were covered.
 4      Q.  You told me that this was the
 5  standard operating procedure for the person
 6  who was placed in a cast to be given
 7  instructions concerning the signs and symptoms
 8  of an actual or impending deep vein thrombosis
 9  or pulmonary embolism. Correct?
10      A.  I believe that's correct.
11      Q.  Did you give this information to
12  Captain Burton at the time you placed the cast
13  or put him in a splint?
14      A.  Yes, sir.
15      Q.  Where did you give them to him?
16      A.  I gave them to him verbally in the
17  emergency room.
18      Q.  Who was present when you gave the
19  instructions to him?
20      A.  I do not specifically recall.
21      Q.  Who was the physician attending
22  him in the emergency room?

Feder Reporting Company
(202) 863-0000

Page 25

 1      A.  Do you mean insofar as the
 2  emergency room physicians?
 3      Q.  Yes, sir.
 4      A.  (Pause). I am not sure if I am
 5  reading this correctly but I believe that this
 6  is Dr. Murthy's signature, which would suggest
 7  that she was on that evening.
 8      Q.  Is she still at the hospital?
 9      A.  Yes, sir.
10      Q.  Where is she located?
11      A.  In the emergency room.
12      Q.  Is she civilian or military?
13      A.  She is civilian, sir.
14      Q.  What is her first name?
15      A.  I don't know.
16      Q.  Tell me the circumstances -- what
17  did you tell him the signs and symptoms of an
18  impending pulmonary embolism were?
19      A.  I don't recall the specific
20  conversation but, in general, it would include
21  significant swelling above the calf. It would
22  include the thigh level. Erythema of the leg.

Feder Reporting Company
(202) 863-0000

Page 26

1   Increased pain in the leg. Chest pain and
2   shortness of breath.
3       Q.   Do you have, as you sit here,
4   actual recall of telling that to Captain
5   Burton?
6       A.   I am certain that we had a
7   detailed discussion of the risks of operative
8   and nonoperative treatment for his Achilles
9   tendon rupture. I know for certain that that
    took place. And part of that discussion is
    always to, in addition to the risks of
    bleeding, infection, or tendon rerupture,
    would include a discussion of deep vein
    thrombosis and pulmonary embolism. I always
    cover that.
        Q.   Was his wife present when you gave
    him these instructions?
        A.   I believe she was there for the
    visit, sir, but I don't know if she was there
    at that specific time. I do not recall.
        Q.   That's what I am trying to get at,
    Captain. As you sit here, today, do you have

Feder Reporting Company
(202) 863-0000

Page 27

1   specific recall, not what you normally do, not
2   what your custom, habit and routine practice
3   was, but with respect to this patient, do you
4   have specific recall what you told him?
5       A.   I would state that I always do it,
6   as opposed to just custom or habit, but, no, I
7   do not have specific recall of that.
8       Q.   Do you have specific recall as to
9   whether or not his wife was present?
        A.   Not during that portion of the
    conversation. No, I do not recall.
        Q.   Do you have specific recall as to
    whether Dr. Murthy was present? Is it Murphy
    or Murthy?
        A.   I believe that it is Murthy,
    M U R T H Y.
        Q.   Do you have specific recall as to
    whether Dr. Murthy was present?
        A.   No, sir, I do not recall.
        Q.   Did you include in your notes,
    anyplace in the notes, and if it is not in
    Exhibit Number 3, is there any place in your

Feder Reporting Company
(202) 863-0000

Page 28

1   notes where you indicate that you counseled
2   Captain Burton concerning the risks associated
3   with immobilization of his leg in a cast in
4   the lower extremities?
5       A.   No, sir, not to my knowledge.
6       Q.   We can agree, can we not, that if
7   a person's lower extremity is immobilized in a
8   cast, that it increases the risk of a deep
9   vein thrombosis?
10      A.   I would agree that the risk of
11  someone in a cast, lower extremity cast, is
12  higher than someone who is not in a lower
13  extremity cast. That's correct.
14      Q.   Would you agree a person who gets
15  a deep vein thrombosis is at high risk of
16  having pulmonary embolism?
17      A.   I would be cautious as to how I
18  characterize high risk. But, certainly, they
19  are at some risk for that, yes.
20      Q.   Untreated, if a person is in a
21  cast and he has edema -- what is edema?
22      A.   Swelling.

Feder Reporting Company
(202) 863-0000

Page 29

1       Q.   And edema, if a cast, a casted
2   person, does this increase the risk of deep
3   vein thrombosis?
4       A.   Not specifically, no.
5       Q.   Does edema increase the risk of
6   pulmonary embolism?
7       A.   Not beyond whatever the risks of
8   whatever was causing the edema.
9       Q.   I am going to direct your
10  attention to Plaintiff's Exhibit Number 3.
11  You have a page number on the bottom as nine
12  but it is the first page of Exhibit Number 3.
13      Whose writing is on this page?
14      A.   I believe that's all mine, sir.
15      Q.   And this is a record of a
16  consultation. Correct?
17      A.   Yes, sir.
18      Q.   And you were called to the
19  emergency room by Dr. Murthy?
20      A.   Yes, sir. Or one of her
21  associates.
22      Q.   And I assume that you were at that

Feder Reporting Company
(202) 863-0000