UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

DOSHIA DANIELS BURTON,       :
et al.,                      :
                             :
            Plaintiffs       :
                             : Civil Action No.
       vs.                   : 05-2214 (JGP)
                             :
UNITED STATES OF AMERICA:
                             :
            Defendant        :

Washington, D.C.

October 27, 2006

Deposition of:

WILLIAM DOUKAS, M.D., called for oral examination by counsel for Plaintiffs, pursuant to notice, at the Walter Reed Army Medical Center, Building 2, 3rd Floor, Regimental Conference Room, Washington, D.C., before Zev V. Feder, CSR, a Notary Public in and for the District of Columbia, beginning at 2:02 p.m., when were present on behalf of the respective parties:

Page 14

```
 1      Q.   Was there any written policy
 2  describing -- policy, advisory, anything of
 3  that nature, which informed clinicians,
 4  physicians that, in fact, certain persons were
 5  at increased risk of pulmonary embolism or
 6  deep vein thrombosis?
 7      A.   There are texts and articles,
 8  et cetera, that are reviewed by the residents,
 9  teaching staff, et cetera, during morning
10  report that outline those issues, but nothing
11  written, per se, that exists within the
12  hospital, itself.
13      Q.   Were there -- for example, with
14  respect to falls, preventions, et cetera,
15  there are clinical guidelines for the
16  prevention of falls.  Is that correct?
17      A.   Well, they may exist but we don't
18  have them published within our clinic, if
19  that's what you are asking.
20      Q.   Are all persons who have trauma to
21  the lower extremities, and are who are
22  immobilized with a cast, is the risk equal in
```

Feder Reporting Company
(202) 863-0000

Page 15

```
 1  all those patients for deep vein thrombosis
 2  and pulmonary embolism?
 3      A.   No, the risk would be different.
 4      Q.   What factors would influence the
 5  risk?
 6      A.   Comorbidities.
 7      Q.   Do you mean other disease
 8  processes?
 9      A.   Correct.
10      Q.   Anything else?
11      A.   Position.  Position of the
12  extremity could also put somebody at risk.
13  Those are the major factors.
14          Previous history of deep vein
15  thrombosis.
16      Q.   Are there any other risk factors
17  which the residents were advised, to your
18  knowledge?
19      A.   Well, it is hard for me to talk
20  about specifics but, certainly, we talk about
21  smoking; we talk about comorbidities, as I
22  have discussed.  All those issues, the
```

Feder Reporting Company
(202) 863-0000

Page 16

```
 1  residents are aware of those.
 2          Are they discussed on each
 3  individual case?  Well, when I am not present
 4  to witness that, it is hard for me to answer
 5  that question.  But, certainly, that is our
 6  intention, that the patients are counseled
 7  accordingly.
 8      Q.   Were there clinical guidelines for
 9  putting -- there should be further
10  investigation of a patient, such as with
11  venograms, or something of that nature, for
12  patients who are at high risk of deep vein
13  thrombosis?
14      A.   Residents are aware of clinical
15  signs that suggest that, and will take
16  appropriate action to further investigate it
17  if warranted.
18      Q.   Were there any written policies
19  with respect to further investigation of
20  patients who were at high risk for deep vein
21  thrombosis?
22      A.   No written policies.
```

Feder Reporting Company
(202) 863-0000

Page 17

```
 1      Q.   After reviewing his records,
 2  speaking of Captain Burton's records, did you
 3  determine the clinical probability of Captain
 4  Burton, as he presented on January 15th, of
 5  him having a deep vein thrombosis?
 6      A.   No.
 7      Q.   Did you discover in his records
 8  that he had a history of his leg being
 9  immobilized in a cast prior to January 15th?
10      A.   Without having the records
11  directly in front of me --
12      Q.   Would you like to look at the
13  records?
14      A.   Sure.
15      Q.   You don't have copy of them?  I
16  have a copy.
17          MR. RANIERI:  You can use your
18  copy.
19          (Discussion off the record.)
20          BY MR. EATON:
21      Q.   Better still, why don't we use
22  this.  We have already marked this.
```

Feder Reporting Company
(202) 863-0000

Page 18

1        That has been marked previously
2   as, what is it, Exhibit Number 1 to Captain
3   Potter's deposition, I believe.
4        A.   (Pause). Your question, again,
5   specifically?
6        Q.   We can agree the injury occurred
7   on the 10th of January of '03. Correct?
8        A.   That appears to be correct, based
9   on the record, yes.
10       Q.   By January 15th he had been
11  immobilized, I believe, in not a cast but --
12       A.   A splint.
13       Q.   A split?
14       A.   That is correct.
15       Q.   My question to you is, as of the
16  15th, did he have a history of his leg being
17  immobilized in a splint for five days at the
18  time?
19       A.   (Pause). That appears to be the
20  case. It looks like the plan on the 15th of
21  January was to convert him from a splint to
22  the cast.

              Feder Reporting Company
                 (202) 863-0000

Page 19

1        Q.   In fact, on numbered page nine, it
2   states that he had a splint in a gravity
3   equinus position. Correct?
4        A.   Correct.
5        Q.   Using that fact, we can agree that
6   he had been immobilized for a period of
7   approximately four to five days at that time.
8        A.   That appears to be correct.
9        Q.   Also, at that time he had been
10  bedridden for more than three days at that
11  time. Correct?
12       A.   I don't know the answer to that.
13       Q.   If a person has been instructed to
14  keep his leg elevated to the maximum extent
15  possible, would such a person be considered
16  bedridden?
17       A.   No.
18       Q.   What would be your understanding
19  of bedridden?
20       A.   Bedridden, to me, means in bed.
21       Q.   All day or just continuously?
22  What do you mean?

              Feder Reporting Company
                 (202) 863-0000

Page 20

1        A.   I don't know how to answer that.
2   I think that is open to the interpretation of
3   the patient as they deliver that message. I
4   don't know how to answer that question.
5        Q.   Assuming that a patient had been
6   bedridden, and I am asking you to assume for
7   purposes of my question, and the person had
8   been bedridden and had had his lower extremity
9   immobilized for a period of five days, how
10  would you characterize the risk of a person
11  for deep vein thrombosis?
12            MR. RANIERI: I will object to the
13  form of the question.
14            MR. EATON: Fair enough.
15            THE WITNESS: And I am not sure I
16  quite understand the question.
17            BY MR. EATON:
18       Q.   Let me try again.
19       A.   Okay.
20       Q.   As your father can tell you, I am
21  not the most articulate person in the world.
22            First of all, if the person --

              Feder Reporting Company
                 (202) 863-0000

Page 21

1   this is for purpose of a hypothetical -- if,
2   in fact, a person had been immobilized in a
3   splint for five days, and in addition to that
4   the person had been bedridden, had been waited
5   on head and foot for approximately five days,
6   how would you characterize this person's risk
7   of a thromboembolitic event such as a DVT?
8        A.   Would that increase it or decrease
9   it? Is that what you are asking?
10       Q.   My question is, if you can
11  characterize it in these categories. Would it
12  be at low risk, moderate risk, high risk for a
13  DVT?
14            MR. RANIERI: Objection to the
15  form of the question.
16            You can answer.
17            THE WITNESS: I think that is
18  situational, depending on, again,
19  comorbidities, whether or not this patient is
20  a smoker, invalid. There are many factors
21  that would come into play, as I would answer
22  that question.

              Feder Reporting Company
                 (202) 863-0000

Page 22

```
 1        But prolonged bedrest would put
 2   somebody at higher risk for DVT.  That is
 3   correct.
 4        BY MR. EATON:
 5   Q.   Are you able to quantify such a
 6   person with -- again, assuming the facts as I
 7   have given them to you, hypothetically, do you
 8   have an estimate of what would be the
 9   probability of this person experiencing a deep
10   vein thrombosis?
11   A.   Absolutely not.
12   Q.   What was required of a clinician
13   if the person presented with a clinical
14   picture that suggested that the risk of deep
15   vein thrombosis was approximately 19 percent?
16   What actions, if any, were required of the
17   clinician, he was taught should be done if, in
18   fact, a person presented with a 19 percent
19   risk of deep vein thrombosis?
20   A.   I think with any encounter that a
21   physician has with a patient who is at risk
22   for DVT, it needs to be discussed.  Clinical
```

Feder Reporting Company
(202) 863-0000

Page 23

```
 1   warning signs need to be communicated.  And
 2   the relative risk, when you say 19 percent, is
 3   not so much a factor as just making the
 4   patient aware that these things can and may
 5   happen.
 6   Q.   What would trigger, in your
 7   opinion, sir, the need for further testing to
 8   rule out a deep vein thrombosis in a person
 9   who had been demonstrated, a person with a
10   similar picture, that 19 percent of the
11   persons would, in fact, have a deep vein
12   thrombosis?
13   A.   I think there has to be clinical
14   signs that suggest this is going on.  In the
15   absence of clinical signs, it is very
16   difficult to further evaluate without evidence
17   that these tests need to be ordered.
18   Q.   Do you have, at the present time,
19   written instructions for patients who are
20   casting the lower extremities?
21   A.   We do.
22   Q.   It is possible to publish them as
```

Feder Reporting Company
(202) 863-0000

Page 24

```
 1   of 2003.  Correct?
 2   A.   I don't recall exactly when we
 3   published them but it was probably sometime
 4   late in that year, correct.
 5   Q.   My question was, there was nothing
 6   to prevent you from having them published
 7   prior to that time?  I say you, speaking of
 8   the institution.
 9   A.   No.
10   Q.   I wasn't able to tell.  I don't
11   know if you were.  What was Captain Burton's
12   blood type.  Were you able to tell from the
13   record?
14   A.   His blood type?
15   Q.   Would that be of any significance
16   in determining the risk that a person had?
17   A.   Not to my knowledge.
18   Q.   So would it be a fair statement to
19   say that the resident physician, Dr. Potter,
20   would not have been instructed that blood
21   type, people with type A blood, were at
22   increased risk of thromboembolic events?
```

Feder Reporting Company
(202) 863-0000

Page 25

```
 1   A.   He may or may not know that to be
 2   true.  I don't know that to be true.  Maybe
 3   that's in the literature.  I am not aware of
 4   it.
 5   Q.   Who was the casting technician?
 6   Are you able to tell from the records?
 7   A.   I don't know.  Is there a place I
 8   can refer to look?
 9   Q.   No, sir.  I didn't see it in
10   there.
11   A.   I don't know.
12   Q.   Do you know who was in charge or
13   who was at that time in charge of the casting
14   technicians?
15   A.   Speculation?  Certainly one of
16   your NCOICs.  Perhaps Staff Sergeant Copeland.
17   I don't recall.
18   Q.   How could I determine who would
19   know who the casting technician was at that
20   time?
21   A.   On any given day, that is going to
22   be very difficult for us to determine that.
```

Feder Reporting Company
(202) 863-0000