**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| | ) | |
| **DOSHIA DANIELS BURTON, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **05-CV-2214 (RCL)** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

---

## <u>MEMORANDUM OPINION</u>

### I.     INTRODUCTION.

On February 20, 2003, Samuel E. Burton, a retired United States Coast Guard captain who had recently had his leg placed in a cast at the Walter Reed Army Medical Center to treat a rupture of his Achilles tendon, died from a massive pulmonary embolism.  He was convalescing on his living-room couch when a blood clot moved from his leg to his lungs and blocked both arteries, cutting off his blood circulation.  Alone in his home, Capt. Burton rose to his feet, staggered toward his front door in search of aid, and collapsed on the floor, dead, after only two or three steps.

Family members later learned that Capt. Burton had developed deep venous thrombosis—a blood clot in the deep veins of his leg—as a consequence of casting.  They also learned, much too late, that Capt. Burton had suffered tell-tale warning signs of deep venous thrombosis—chest pain and short-windedness—and that if immediate medical attention had been sought, Capt. Burton would likely be alive and well today.

Capt. Burton's death was an unnecessary tragedy. His doctors never warned him that deep venous thrombosis and pulmonary embolus could result from casting. They never told him what the warning signs were that such thrombosis might be developing and leading to a deadly pulmonary embolism if medical attention was not quickly sought. If only Capt. Burton had known what to watch for—if only his doctors had warned him—his wife would have her husband and his son would have his father. As discussed below, the United States is therefore liable for medical malpractice based on its failure to warn Capt. Burton of the risks and warning signs of deep venous thrombus and pulmonary embolus.

## II.      BACKGROUND.

### A.      Medical Terminology.

Venous thromboembolism ("VTE") is a term used to describe both pulmonary embolus ("PE") and deep venous thrombosis ("DVT"). *See* A.D.A.M. MEDICAL ENCYCLOPEDIA, Deep Venous Thrombosis, http://www.nlm.nih.gov/medlineplus/ency/article/000156.htm (last visited Nov. 9, 2009) [hereinafter Deep Venous Thrombosis]; A.D.A.M. MEDICAL ENCYCLOPEDIA, Pulmonary Embolus, http://www.nlm.nih.gov/medlineplus/ency/article/000132.htm (last visited Nov. 9, 2009) [hereinafter Pulmonary Embolus]; (Trial Tr. vol. 2, 35:17–:25, Mar. 10, 2009).

DVT is the formation of "a blood clot in one of the deep veins of the legs." Pulmonary Embolus, *supra*; *see also* Deep Venous Thrombosis, *supra*. A proximal DVT is one that occurs above the knee; a distal DVT is one that occurs below. (Trial Tr. vol. 1, 109:5–:11, Mar. 9, 2009.)

PE is "a blockage of an artery in the lungs by," *inter alia*, "a blood clot," the most common type of which is a clot associated with DVT. Pulmonary Embolism, *supra*.

**B.     Facts.**

On January 10, 2003, Captain Samuel Burton, a retired officer of the United States Coast Guard, ruptured his Achilles tendon while playing basketball.  His wife, Doshia Daniels Burton, took Capt. Burton to the emergency room at the Walter Reed Army Medical Center (WRAMC) in the District of Columbia for treatment of his injury.  Capt. Burton received an orthopedic consultation with Benjamin Kyle Potter, M.D., who presented Captain Burton with two treatment options: surgical repair, which involved suturing the tendon back together, or casting of the leg, which would allow the tendon to heal itself.  (Trial Tr. vol. 1, 38:7–:21.)  Capt. Burton elected the casting option.  (*Id.* at 40:18–41:3.)  The plan was to first place a soft splint on the leg, to allow the initial swelling from the injury to subside, and then after a few days to place the lower leg in a hard cast starting just below the knee and ending just above the toes.  With both the splint and the cast, the leg was initially immobilized in a "gravity equinus" position, that is, with the toes pointing down.  This was intended to shorten the calf muscles as much as possible to allow the ruptured portions of the Achilles tendon to begin to heal themselves.  The plan was to keep the leg casted for a total of about eight weeks, changing the cast periodically to gradually bring the toes up from the toe-down position.  (*Id.* at 38:7–:21.)

Dr. Potter placed Capt. Burton's left leg in a splint on January 10, which was replaced with a hard cast on January 15.  (Trial Tr. vol. 3, 20:9–:19, Mar. 11, 2009.)  On February 7, 2003, Captain Burton returned for his three-week follow-up appointment, where he was given a new cast.  Capt. Burton complained of swelling at night, which Dr. Potter indicated was normal.  Dr. Potter also checked Capt. Burton's leg for swelling, tenderness, or popliteal cords, all of which would signify the presence of DVT; none were found.  Dr. Potter also noted that Capt. Burton had normal sensation, pulse, and capillary refill in his lower leg, and that Capt. Burton's

peri-ankle swelling was in a normal range.  (Trial Tr. vol. 1, at 47:7–:17, 49:3–:17, 50:10–:14, 51:1–:6, 106:19–107:15, 107:21–108:3, 108:13–:23.)   Mrs. Burton was present at all three visits.  (*Id.* at 41:10–:15; Trial Tr. vol. 2, 217:5–217:10; 224:18–225:15.)  There are no records of warnings having been given to the Burtons regarding VTE during these visits.  (Trial Tr. vol. 1, 30:13–:24.)

On February 9, one day after he had walked some distance through snow on crutches, Capt. Burton experienced pain in his chest and became "absolutely winded" after walking up seven steps in his home; he rested and "breathed a great sign of relief," saying: "That was scary." (Trial Tr. vol. 3, 21:11–:25.)  He and Mrs. Burton attributed these symptoms to his physical exertion on crutches and relieved the pain with ibuprofen.  (*Id.* at 12:19–:24, 21:11–:25.)  On February 20, Capt. Burton "got on his knees and pulled a box out of a cubbyhole in the closet. He again became winded."  (*Id.* at 22:1–:8.)  The Burtons "again related it to the fact that he had been virtually inactive for eight weeks."  (*Id.*)  Later that day, Capt. Burton suffered a massive PE and died.  (*Id.* at 20:21.)

### III.      ANALYSIS.

### A.      Jurisdiction Is Proper.

The defendant defends (without detail) that the plaintiffs' claims are "barred for lack of jurisdiction."  (Answer 6.)  The defendant also, however, makes the more specific jurisdictional defense that the "[p]laintiffs failed to exhaust their administrative remedies."  (*Id.*)  Although the defendant has not pressed these defenses at trial, the Court considers them as averred in the defendant's Answer.  Both defenses fail.

### 1.      The Court Has Personal Jurisdiction Over the United States.

The general standard for determining whether a court has personal jurisdiction over a defendant is whether "maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  Where the United States is the defendant, such notions are not offended so long as the United States is properly served with notice of suit.  *See, e.g.*, *Lathrop v. Unidentified, Wrecked & Abandoned Vessel*, 817 F. Supp. 953, 961 (1993) (noting that the court "lacks in personam jurisdiction over the United States" but that such defect would be remedied "in the event that the United States has been properly served"); *In re McDougald*, 1991 WL 635259, at *1 (S.D. Ga. Apr. 25, 1991) (noting that the court has personal jurisdiction where "the United States has received adequate notice of the pendency of [an] action and will [therefore] not be prejudiced in maintaining its defense on the merits").

To properly serve the Unites States, a potential plaintiff must, within 120 days, (1) "deliver a copy of the summons and of the complaint to the United States attorney for the district where the action is brought," (2) "send a copy of each by registered or certified mail to the civil-process clerk at the United States attorney's office," and (3) "send a copy of each by registered or certified mail to the Attorney General of the United States at Washington, D.C."  FED. R. CIV. P. 4(i)(1)(A)–(B).  In this case, the United States has not pleaded that it did not receive notice or that it received defective notice and the Court has no reason to suspect that such notice was not received or was defective.  The Court therefore finds that the plaintiffs did indeed satisfy the aforementioned requisites of proper service and that it has personal jurisdiction over the United States.

2.      **The Court Has Subject-Matter Jurisdiction.**

The Federal Tort Claims Act (FTCA)[1] waives sovereign immunity in this case, granting

the Court subject-matter jurisdiction, which is not otherwise stripped by the *Feres* doctrine.

Furthermore, the plaintiffs have exhausted their administrative remedies, satisfying the

jurisdictional prerequisite of administrative-remedy exhaustion.  The Court therefore has subject-

matter jurisdiction over this case.

a.      **The FTCA Waives Sovereign Immunity in This Case.**

It is a well-recognized principle of sovereign immunity that "the United States may not

be sued without its consent."  14 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL

PRACTICE AND PROCEDURE § 3654 (3d ed. 1998).  The FTCA, however, partially grants such

consent:

> [T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims
> against the United States, for money damages, accruing on and after January 1,
> 1945, for . . . personal injury or death caused by the negligent or wrongful act or
> omission of any employee of the Government while acting within the scope of his
> office or employment, under circumstances where the United States, if a private
> person, would be liable to the claimant in accordance with the law of the place
> where the act or omission occurred.

§ 1346(b)(1).  This case falls within the requirements of the FTCA.

The plaintiffs commenced this action against the United States (*see* Compl.) for money

damages (Compl. ¶ 42).  The plaintiffs' claim accrued in 2003 (long after January 1, 1945).  (*See*

Compl. ¶¶ 8–30.)  The plaintiffs bring their wrongful death and survival actions based on the

alleged negligence of medical personnel employed by the Government, where such negligence

---

[1] Ch. 753, tit. IV, 60 Stat. 812, 842-47 (1946) has been largely repealed, *see* Act of June
25, 1948, Pub. L. No. 80-773, 62 Stat. 869 (revising, codifying, and enacting into law title 28,
United States Code), but its contents have been substantially recodified at 28 U.S.C. §§ 1291,
1346, 1402, 2401, 2402, 2411, 2412, 2671-2680 (2006).  Despite the original repeal, these
current sections are still commonly referred to as the FTCA.

occurred in the scope of such employment.  (*See* Compl. ¶¶ 31–40.)  It is plain that were the defendant not the United States, but instead a private person, such person would not be immune from suit.  Therefore, the Court has jurisdiction under § 1346(b)(1).

>    **b.**      **The *Feres* Doctrine Does Not Strip the Court of Subject-Matter Jurisdiction in This Case.**

"Sovereign immunity is jurisdictional in nature."  *FDIC v. Meyer*, 510 U.S. 471, 475 (1994), *quoted in Trudeau v. FTC*, 456 F.3d 178, 185 (D.C. Cir. 2006).  "The *Feres* doctrine, which limits the scope of the FTCA's waiver of sovereign immunity, is likewise jurisdictional." *Brown v. United States*, 151 F.3d 800, 804 (8th Cir. 1998); *accord Schnitzer v. Harvey*, 389 F.3d 200, 202 (D.C. Cir. 2004).

In *Feres v. United States*, the Supreme Court recognized an exception to the FTCA's broad waiver of sovereign immunity in tort actions, holding that "the Government is not liable . . . for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service."  340 U.S. 135, 146 (1950).  This Circuit has developed a three-part incident-to-service test to determine whether an activity giving rise to an injury is, in fact, "incident to service" under *Feres*.  *Id.*   Courts are to consider "the injured service member's duty status, the site of the injury[,] and the nature of the activity engaged in by the service member at the time of his injury."  *Schnitzer*, 389 F.3d at 203 (citing *Verma v. United States*, 19 F.3d 646, 648 (D.C. Cir. 1994)).  The Supreme Court has cautioned, however, that "[t]he *Feres* doctrine cannot be reduced to a few bright-line rules" and that "each case must be examined in light of" development of the doctrine in caselaw.  *United States v. Shearer*, 473 U.S. 52, 57 (1985).  The Court will therefore apply the incident-to-service factors with particular consideration given to medical-malpractice precedent of this Circuit.

This District held only one year ago that "[m]edical treatment of military personnel at a military hospital undoubtedly satisfies the 'incident to service' requirement." *Singleton v. Dep't of the Army*, No. 07-CV-303 (AK), 2007 WL 2601934, at *3 (D.D.C. Sept. 6, 2007). *Singleton* relied on an earlier case in our District, *Antoine v. United States*, which held that the mere fact that the plaintiff brought "a tort claim against the Government for injuries alleged to have occurred due to the negligence of military doctors working at military medical facilities and performing official duties" necessitated application of the *Feres* doctrine to bar recovery. 791 F. Supp. 304, 306 (D.D.C. 1992); *see also Mikso v. United States*, 453 F. Supp. 513, 514 (D.D.C. 1978) ("[T]ortious acts against an active duty serviceman which are alleged to have occurred solely at the hands of military doctors working at military medical facilities and performing official duties . . . [are] a sufficient basis on which to invoke *Feres* immunity.").

*Singleton*, *Antoine*, and *Mikso*, all concerned injuries suffered by active-duty servicemen, weighing heavily on incident-to-service factor one in favor of *Feres* immunity. Where the injury has been suffered by veterans, however, the cases have come out differently. In *Thornwell v. United States*, the plaintiff had, without his knowledge or consent, been administered lysergic acid diethylamide ("LSD") as part of a covert test of the effects of the psychedelic drug on interrogation subjects. 690 F.2d 215, 346 (D.C. Cir. 1982). The test took place while the plaintiff was in military service. *Id.* Upon his discharge from service, the plaintiff was never warned of the harmful effects of his LSD exposure. *Id.* The District Court concluded that although *Feres* barred any recovery relating to in-service LSD exposure, it did not preclude suit alleging post-discharge failure to warn. *Id.* at 347–53. *Cf. Lombard v. United States*, 690 F.2d 215, 220 (D.C. Cir. 1982) (distinguishing *Thornwell* when, in *Lombard*, a duty to warn attached before discharge). *See also United States v. Brown*, 348 U.S. 110 (1954) (allowing an action to

proceed concerning post-discharge malpractice, even where such malpractice was preformed on an injury suffered while in service), *cited in Lombard*, 690 F.2d at 229–30 (Ginsburg, J., dissenting) ("[F]ederal courts have recognized a claim for negligent post-discharge failure to warn . . . .").

The instant case is more similar to *Thornwell* and *Brown* than *Singleton*, *Antoine*, or *Mikso*. Capt. Burton suffered his injury after having retired from the U.S. military; the failure to warn occurred totally after Capt. Burton had been discharged from service. Accordingly, factor one counsels against finding that Capt. Burton's death was incident to his military service under *Feres*. Additionally, the site of the injury was a private basketball court, not the battlefield. Factor two thus also counsels against *Feres* immunity. Finally, the nature of the activity giving rise to the injury—a basketball game played not on a military base, not during downtime by active-duty military members, etc.—was totally unrelated to military service. Factor three thus also counsels against *Feres* immunity. Because all three factors point toward Capt. Burton's injury as not being incident to his military service, the *Feres* doctrine does not preclude the Court from exercising jurisdiction over this matter. The plaintiffs may proceed.

### 3. The Plaintiffs Have Exhausted Administrative Remedies.

"The FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies," *McNeil v. United States*, 508 U.S. 106, 113 (1993), and the Court of Appeals for the District of Columbia Circuit treats "the FTCA's requirement of filing an administrative complaint with the appropriate agency prior to instituting an action as jurisdictional," *Simpkins v. District of Columbia*, 108 F.3d 366, 371 (D.C. Cir. 1997). Specifically, the FTCA provides in relevant part that an FTCA action "shall not be instituted . . . unless the claimant shall have first presented the claim to the appropriate Federal

agency and his claim shall have been finally denied by the agency." § 2675(a).  Importantly,

"[t]he failure of an agency to make final disposition of a claim within six months after it is filed

shall . . . be deemed a final denial of the claim."  *Id.*

The plaintiffs plead—and the defendant admits—that the plaintiffs filed an administrative

claim with the Walter Reed Army Medical Center's (WRAMC) Office of the Center Judge

Advocate (OCJA) on February 8, 2005, and that such claim was not heard within six months of

such filing.  (Compl. ¶ 1; Answer ¶ 1.)  It is unclear why the OCJA has not acted.  The OCJA

handles issues relating to administrative law, *see* OCJA, WRAMC, Office of the Center Judge

Advocate, http://www.wramc.army.mil/Professionals/admactivity/lc/Pages/default.aspx (last

visited Nov. 9, 2009), and, if necessary, could have passed the matter to the Performance

Improvement / Risk Management Office (PMRM), which handles medical-malpractice claims,

*see* PMRM, WRAMC, Important Things to Know,

http://www.wramc.army.mil/Professionals/admactivity/dmao/Pages/PIRM.aspx (last visited

Nov. 9, 2009).

Regardless, the plaintiffs presented their claim administratively to a component of the

WRAMC, the agency related to the events giving rise to the plaintiffs' claims, and thus the

proper agency from which administrative relief should have been—and was—prayed.  Because

the agency failed to act within six months, it has, as a matter of law, denied the claim.  Having

exhausted their administrative remedies, the plaintiffs satisfy the jurisdictional-exhaustion

prerequisite and may therefore proceed in this Court.

### 4.  Conclusions Concerning Jurisdiction.

The Court has personal jurisdiction over the United States by way of proper service.  The

Court has subject-matter jurisdiction over this case under the FTCA unimpeded by the *Feres*

doctrine.  The plaintiffs have exhausted their administrative remedies.  The defendant's

jurisdictional defenses therefore fail; jurisdiction is proper.

**B.     The Plaintiffs Have Not Failed to State a Claim Upon Which Relief May Be Granted.**

A plaintiff's complaint must state a claim upon which relief may be granted, i.e., the

complaint must contain "a short and plain statement of the grounds for the court's

jurisdiction, . . . the claim showing that the pleader is entitled to relief[,] and a demand for the

relief sought."  FED. R. CIV. P. 8(a).  In short, the plaintiffs must plead "enough facts to state a

claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127

(2007).  The defendant contends that the plaintiffs' Complaint fails to state such a claim.

(Answer 6.)  Although the defendant has not pressed this defense at trial, the Court now

considers it as averred in the defendant's Answer.  The defense fails.

The plaintiffs plead in their complaint the grounds for the Court's jurisdiction:  the

United States' being the defendant, the waiver of sovereign immunity by the FTCA, and the

plaintiffs' exhaustion of administrative remedies.  (Compl. ¶ 1.)  The plaintiffs further plead two

claims showing entitlement to relief—wrongful death and a survival action—by alleging

background facts as well as specific facts relating to all elements of the alleged negligence

resulting in wrongful death and to elements of a survival action.  (*Id.* ¶¶ 31–35, 37–39.)  The

plaintiffs finally make a demand for relief—four million dollars.  (*Id.* ¶¶ 36, 40, 42.)  The

plaintiffs have therefore stated a claim upon which relief may be granted, in satisfaction of Rule

8(a) and the *Twombly* standard.

**C.     The Defendant Is Liable Under Both the Survivor Act and the Wrongful Death Act.**

Pursuant to its Pretrial Order of March 6, 2009, the Court will apply District of Columbia

law in this case with respect to all issues of liability.  Under that law, the United States, through

Dr. Potter and fellow WRAMC staff, committed medical malpractice by negligently failing to warn Capt. Burton of the risks and warning signs of VTE, thus causing injury to him before his death and ultimately his wrongful death, thus causing injury to his family.  Therefore, Doshia Daniels Burton, as personal representative of the estate of the decedent, properly brings this survival action on behalf of the decedent and the plaintiffs together properly bring this wrongful death action.

Medical malpractice "is bad or unskillful practice on the part of a physician or surgeon resulting in . . . a physician's breach of duty imposed on him or her by law," such as the common law of negligence.  70 C.J.S. *Physicians and Surgeons* § 81 (2005). "The essential elements for an action in negligence are that the defendant was under a duty to protect the plaintiff from injury, that the defendant breached that duty, that the plaintiff suffered actual injury or loss, and that the loss or injury proximately resulted from the defendant's breach of the duty."  65 C.J.S. *Negligence* § 21 (2000).  In the District of Columbia, in a medical-malpractice negligence action, these "essential elements . . . , i.e., duty, breach, causation[,] and damages," *Hardi v. Mezzanotte*, 818 A.2d 974 (D.C. 2003) (citations and quotation marks omitted), are applied such that "the plaintiff has the burden of proving the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury," *Giordano v. Sherwood*, 968 A.2d 494, 498 (D.C. 2009) (citation and quotation marks omitted); *see also Nwaneri v. Sandidge*, 931 A.2d 466, 470 (D.C. 2007), *cited in Sanders v. United States*, 572 F. Supp. 2d 194, 197 (D.D.C. 2008) (applying D.C. law).

A cause of action based on medical-malpractice negligence in the District of Columbia arises under the Survival Act when, prior to a decedent's death, a medical-malpractice negligence action has accrued in favor of the decedent that may be pursued by his estate.  *See*

D.C. CODE § 12-101 (2001).[2]  A cause of action for wrongful death based on medical-malpractice negligence in the District of Columbia, however, arises when medical malpractice negligently causes the death of a person, thus injuring the decedent's spouse.  *See* D.C. CODE § 16-2701(a) (2001)[3]; *see, e.g.*, *Nelson v. Am. Nat'l Red Cross*, 26 F.3d 193, 199 (D.C. Cir. 1994). At base, a survival action is a negligence action pursued by the estate of the decedent victim—all that need be proven are the ordinary elements of negligence—whereas a wrongful death action is an action pursued by a survivor in his capacity as a victim himself, requiring proof of both the underlying negligence action as well as injury to the survivor.

To prevail on their survival action, the plaintiffs must therefore prove by a preponderance of the evidence that an actionable claim based on medical-malpractice negligence accrued in favor of Capt. Burton before his death, which in turn requires that the plaintiffs prove (1) the standard of care owed by the WRAMC to Capt. Burton and (2) a breach of that standard by the WRAMC that (3) caused injury to Capt. Burton before his death.  To prevail on their wrongful death action, the plaintiffs must not only prove the aforementioned elements, but also that (4)

---

[2] "On the death of a person in whose favor or against whom a right of action has accrued for any cause prior to his death, the right of action, for all such cases, survives in favor of or against the legal representative of the deceased."  § 12-101.

[3] When, by an injury done or happening within the limits of the District, the death of a person is caused by the wrongful act, neglect, or default of a person or corporation, and the act, neglect, or default is such as will, if death does not ensue, entitle the person injured, or if the person injured is married or domestic partnered, entitle the spouse or domestic partner, either separately or by joining with the injured person, to maintain an action and recover damages, the person who or corporation that is liable if death does not ensue is liable to an action for damages for the death, notwithstanding the death of the person injured, even though the death is caused under circumstances that constitute a felony.

§ 16-2701(a).

Capt. Burton's death caused injury to the plaintiffs themselves.  As discussed below, the plaintiffs have met their burden.

  1.    **The Standard of Care Includes the Duty to Warn.**

    a.    **Warnings Must Be Given.**

At the outset, the plaintiffs bear the "burden of establishing, through expert testimony, 'the applicable standard of care.'"  *Nwaneri*, 931 A.2d at 470 (quoting *Travers v. District of Columbia*, 672 A.2d 566, 568 (D.C. 1996)).[4]  "In the District of Columbia, the applicable standard of care in a medical malpractice action is 'a national standard, not just a local custom.'" *Id.* (quoting *Travers*, 672 A.2d at 568).  The plaintiffs must therefore prove "'the course of action that a reasonably prudent doctor with the defendant's specialty would have taken under the same or similar circumstances.'"  *Id.* (quoting *Travers*, 672 A.2d at 568).  To establish that course of action, the plaintiffs' experts must do more than offer personal opinions as to how they would act in a particular circumstance.  *Id.* (citing *Strickland v. Pinder*, 899 A.2d 770, 770 (D.C. 2006)).  They "must establish that a particular course of treatment is followed nationally either through [r]eference to a published standard, [discussion] of the described course of treatment with practitioners outside the District . . . at seminars or conventions, or through presentation of relevant data."  *Id.* (quoting *Strickland*, 899 A.2d at 773–74 (quotation marks omitted)).

---

    [4] Expert testimony is required to prove the elements of negligence, "except where proof is so obvious as to lie within the ken of the lay" finder of fact.  *Derzavis v. Bepko*, 766 A.2d 514, 519 (D.C. 2000) (quoting *Washington v. Wash. Hosp. Ctr.*, 579 A.2d 177, 181 (D.C.1990) (citations and quotation marks omitted)).  Proof concerning "the exercise of professional skill and judgment" is beyond the ken the Court, absent expert testimony.  *Id.* at 520 (quoting *Harris v. Cafritz Mem'l Hosp.*, 364 A.2d 135, 137 (D.C. 1976) (quotation marks omitted)); *see, e.g.*, *Carmichael v. Carmichael*, 597 A.2d 1326, 1329 (D.C. 1991) (holding that a judge could not rely on mere common knowledge and experience in a medical-malpractice case).  The plaintiffs therefore must proffer evidence through expert opinions in this case.

District of Columbia tort law recognizes that the national standard of care places physicians under the general duty to warn patients of the "dangers lurking" in treatments they propose. *Cauman v. George Wash. Univ.*, 630 A.2d 1104, 1108 (D.C. 1993) (quoting *Canterbury v. Spence*, 464 F.2d 772, 782 (1972) (applying D.C. law) (quotation marks omitted)). More specifically, expert opinion convinces the Court that the standard of care in this case required the defendant to warn Capt. Burton of the danger of VTE lurking in the non-surgical (i.e., casting) treatment of his Achilles-tendon rupture.[5]

The WRAMC is accredited by the Joint Commission (formerly the Joint Commission on Accreditation of Healthcare Organizations (JCAHO)). (Trial Tr. vol. 2, 7:7–:9.) The Joint Commission annually publishes its *Hospital Accreditation Standards*, the 2002 version of which was published relatively recently before Capt. Burton's death. *See* JCAHO, 2002 HOSPITAL ACCREDITATION STANDARDS (2001). The plaintiffs introduced into evidence a portion of those standards relating to patient and family education—PF 3.9—which states: "Discharge instructions are given to the patient and those responsible for providing continuing care." *Id.* at 151; (Trial Tr. vol. 2, 66:20–68:3). The Commission explains that such instructions inform patients and their families about "when and how to obtain further care or treatment after discharge; specific treatment procedures; self-care; how to make lifestyle choices and changes; and how to manage continuing care." JCAHO, *supra*, at 151. Specifically concerning the risk of developing DVT and suffering a pulmonary embolism due to the casting of a leg, the plaintiffs introduced into evidence a separate document published by the American College of Chest

---

[5] The Court notes that the plaintiffs argue that additional duties were owed and breached by the defendant, namely that the defendant failed to adequately examine Capt. Burton (and thus failed to discover his DVT) and adequately supervise Dr. Potter. (Compl. ¶ 33; Pls.' Proposed Findings of Fact and Conclusions of Law ¶ 27.) The Court does not reach these arguments, as this decision is rendered solely on the narrower issue of the duty to warn.

Physicians, which admonishes that, as part of the sort of instructions recommended by JCAHO, "all patients with lower extremity fractures or injuries should be warned to promptly seek medical attention if symptoms of possible DVT or PE arise."  William H. Geerts, M.D., et al., *Prevention of Venous Thromboembolism*, 119 CHEST 132S, 147S (2001) [hereinafter Geerts, M.D., et al., *Prevention of Venous Thromboembolism I*]; (*see* Trial Tr. vol. 2, 65:1–66:12.)

At trial, the plaintiffs offered the expert testimony of Paul Genecin, M.D.  (*See id.* at 3:10.)  Experts may be qualified on the basis of their "knowledge, skill, experience, training, or education," FED. R. EVID. 702, and Dr. Genecin is well qualified as an expert in VTE on all five bases.  A distinguished graduate of Princeton University who received his medical degree from Columbia University, Dr. Genecin served at the time of his testimony in three professional roles as the director of Yale University Health Services, a clinical associate professor of medicine at Yale School of Medicine, and an attending physician in medicine at Yale-New Haven Hospital. (Trial Tr. vol. 2, 3:14–:18; Pls.' Expert Disclosures Pursuant to FRCP 26(b)(2), attach. 6, at 1–2.) In these different capacities, Dr. Genecin has not only witnessed and treated multiple cases of VTE, but also taught other doctors how to treat, recognize, and warn against DVT and PE.  (Trial Tr. vol. 2, 3:23–4:4.)

Dr. Genecin, who is responsible for overseeing and ensuring Yale University Health Services' compliance with the Joint Commission's Accreditation Standards (*id.* at 6:22–7:5), testified in conformity with PF 3.9 and the American College of Chest Physicians' recommendations, agreeing that a patient should be given "instructions to be told to call the hospital if he's experiencing shortness of breath and chest pain" after having ruptured his Achilles tendon and having had such rupture treated with a cast (*id.* at 154:3–:9).

The defendant, focusing on the allegedly low risk of Capt. Burton developing DVT, argues that it was under no duty to warn of the possibility of VTE as a consequence of casting or to advise Capt. Burton of the warning signs of the onset of DVT. (*See* Trial Tr. vol. 3, 124:17– 125:19.) The defendant's expert, William Hodges Davis, M.D., testified that the risks of distal DVT in casted patients can run as high as 30%, but that the risk of more "clinically significant" DVTs is typically less than 4% with the risk of PE at less than 1%. (*Id.*) Dr. Potter, too, claimed that Capt. Burton bore a 1–5% risk for "clinically symptomatic" DVT and resultant PE. (Trial Tr. vol. 1, 64:5–:3, 81:22–82:4.) At first glance, both doctors' testimony comports with the data from multiple studies cited by both the plaintiffs' and the defendant's experts in this case. (*See id.* at 60:5–65:15, 67:18–69:4, 73:14–82:4, 99:22–100:4; Trial Tr. vol. 2, 31:22–35:5, 79:9– 91:19, 96:10–100:25, 118:23–120:4, 124:8–:13, 134:3–140:11; Trial Tr. vol. 3, 114:9–115:21, 124:22–125:9.)[6] Dr. Davis went so far as to testify that it is unnecessary to warn patients of any deadly risks where the risk of death was less than 10%. (Trial Tr. vol. 3, 119:7–:13.) Not surprisingly, his opinion could not be supported by any medical literature or any other reference

---

[6] The studies include: Geerts, M.D., et al., *Prevention of Venous Thromboembolism*, 133 CHEST 381S, 417S tbl.10 (2008); Lasse J. Lapidus, M.D., et al., *Prolonged Thromboprophylaxis With Dalteparin After Surgical Treatment of Achilles Tendon Rupture: A Randomized, Placebo-Controlled Study*, 21 J. ORTHOPAEDIC TRAUMA 52, 55-56 (2006); Kenneth T. Horlander, M.D., et al., *Pulmonary Embolism Mortality in the United States, 1979-1998*, 163 ARCHIVES INTERNAL MED. 1711 (2003); Michael R. Lassen, M.D., et al., *Use of the Low-Molecular-Weight Heparin Reviparin to Prevent Deep-Vein Thrombosis After Leg Injury Requiring Immobilization*, 247 NEW ENG. J. MED. 726, 729 (2002); Geerts, M.D., et al., *Prevention of Venous Thromboembolism I*, *supra*, at 147S.

The parties have agreed that "[a]ny medical literature quoted during testimony under [FED. R. EVID.] 803(18) may be provided to the court in writing as a convenience to assist the court's fact-finding." (Joint Pretrial Stmt. 15.) Portions of the studies cited were so quoted and so provided. (*See* Pls.' Request for Judicial Notice and for Adverse Inference 5-6.) Per the strictures of Rule 803(18), the Court only considers statements made by these studies as evidence to the extent that such statements were called to the attention of or relied upon by expert witnesses.

to the standard of care (*see id.* at 119:11–:14) and must therefore be treated as his personal— inexpert, and most unconvincing—opinion, *see Nwaneri*, 931 A.2d at 470 ("[P]ersonal opinion of the testifying expert . . . without reference to a standard of care, is insufficient . . . .) (quotation marks and citations omitted).  The defendant nonetheless urges the Court to conclude that the relatively minor likelihood of PE resulting from DVT relieves it of any duty to warn patients undergoing non-surgical treatment for Achilles-tendon ruptures of the risks and warning signs of VTE.  (Def.'s Proposed Findings of Fact and Conclusions of Law 22.)  This the Court cannot do.

The plaintiffs point convincingly to the fact that patients who are over age 60, male, and black—three categories applicable to Capt. Burton—face greater risk of DVT and PE from casting than other members of the general population.  (Trial Tr. vol. 1, 67:12–69:3; Trial Tr. vol. 2, 31:4–:13); *see* Horlander, M.D., et al., *supra* note 6, at 1712 fig.1.  At the time he treated Capt. Burton, Dr. Potter was not aware of (or at least could not later recall being aware of) the increased risk presented by these factors.  (Trial Tr. vol. 1, 67:12–69:3.)  The defendant's argument, then, that Capt. Burton faced a relatively low risk for developing DVT and PE is questionable at best.  Regardless, even a 1% risk level is not at all insignificant.  That as many as one in one hundred patients like Capt. Burton face a real threat of *death* should not and does not relieve the defendant of any and all duty to warn such patients about that threat.

The defendant makes much of Dr. Potter's treatment of Capt. Burton on February 7, 2003.  Dr. Potter palpitated Capt. Burton's leg—he checked the leg for swelling, tenderness, or popliteal cords, all of which would signify the presence of DVT—but found no signs of DVT.  (*Id.* at 49:3–:17, 107:6–:15.)  Additionally, Dr. Potter found Capt. Burton's neurovascular sensation to be intact—Capt. Burton had normal sensation, pulse, and capillary refill in his lower leg.  (*Id.* at 51:1–:6, 106:19–107:5.)  Dr. Potter also measured Capt. Burton's peri-ankle

swelling—swelling near the site of the tendon rupture—and found it to be in the "two plus" range on a four-point scale, which Dr. Potter testified was a not only normal, but nearly universal in patients with Achilles-tendon rupture.  (*Id.* at 50:10–:14, 107:21–108:3.)  Finally, Capt. Burton reported increased swelling at night, which Dr. Potter also concluded was not atypical, even several weeks after the original injury and casting.  (*Id.* at 47:7–:17, 108:13–:23.)  The defendant thus argues that Dr. Potter reasonably concluded that Capt. Burton did not have DVT and therefore did not need to be warned of it.  (Def.'s Reply to Pls.' Proposed Findings of Fact and Conclusions of Law 4 n.1.)  But even taking the defendant's arguments at face value and accepting their conclusion that Capt. Burton presented no symptoms of DVT at the visit on February 7, the risk of DVT cannot simply be ruled out and written off.  Negative signs are not necessarily conclusive of the lack of DVT and are certainly not conclusive that DVT will not develop at some point in the future.

The defendant also takes care to note that DVT can develop quickly, allegedly supporting Dr. Potter's conclusion that Capt. Burton did not have DVT on February 7 but might have developed it later.  (Trial Tr. vol. 3, 89:8–:16.)  But the fact that DVT can develop rapidly *increases* the need for adequate warning of the signs and symptoms thereof.  Because a doctor cannot recognize DVT that has not yet developed, and because DVT may develop—quickly—at some time after that doctor has seen his patient, that patient needs to know what to watch for should the onset of DVT occur after his doctor visit.

The Court therefore concludes that the defendant was under a duty to warn Capt. Burton of the risks and warning signs of VTE that could possibly result from the casting of his leg as a non-surgical treatment for the rupture of his Achilles tendon.

### b.     The Court Does Not Decide Whether Warnings Must Be Given in Writing.

The Accreditation Standards admonish that warnings should be provided in written form: "*Written* discharge instructions are provided, in a form the individual can understand, to all individuals and organizations . . . responsible for the patient's care." JCAHO, *supra*, at 151 (emphasis added). The plaintiffs' expert, Dr. Genecin, testified in conformity with the Joint Commission's requisite of written warnings, noting that patients, particularly after an acute injury for which they have received narcotic pain-relief medication, as Captain Burton did on January 10, 2003, should not be expected to absorb instructions and warnings given only orally. (Trial Tr. vol. 2, 68:4–69:3 ("People in healthcare are very familiar with the limitation of what people can absorb in terms of information and instructions, and that's why it's all written down—it's so that you can take it home and read it.").) The defendant, despite arguing that no warning was required in this case, also argued that a verbal warning satisfies the standard of care but presented no evidence that disputed the applicability of the Accreditation Standards. The defendant's argument is further weakened by the acknowledgment by Dr. Potter himself of the importance of written instructions as a reference for patients' later review. (*See* Trial Tr. vol. 1, 31:9–:13.)

The Court does not now decide whether, as a matter of law, warnings must be given in writing. Nor does the Court find, however, that warnings may be given orally. Because the Court finds that no warning was given whatsoever, *see* discussion *infra* Part III.C.2., the issue of the sufficiency of the form of the warning is irrelevant. Suffice it to say in this case that the standard of care requires that warning be given.

      c.      **The Court Does Not Decide Whether Warnings Must Be Recorded in Writing.**

The plaintiffs also point the Court to a separate portion of the Accreditation Standards concerning information management—IM 7.5.2—which states: "The medical record of a patient receiving emergency, urgent, or immediate care notes the conclusions at termination of treatment, including final disposition, condition at discharge, and *instructions for follow up care*." JCAHO, *supra*, at 251 (emphasis added). Not only must patients be given written instructions, the plaintiffs claim, but hospitals must also make written records of the instructions given. Dr. Genecin again testified in conformity with this standard, noting that it ensures "that the patient and the medical record are told the same thing, that the medical record contain documentation of what was advised to the patient at the time of discharge." (Trial Tr. vol. 2, 73:4–:7.) The defendant, through Dr. Potter, retorted that "[i]t's certainly impractical to write down everything that you discuss or talk about with a patient"; a "counseling spiel" should suffice. (Trial Tr. vol. 1, 56:14–:16, 58:9.)

Again, the Court does not now decide whether, as a matter of law, a patient's medical record need contain written evidence of warnings or other instructions given to the patient. Nor does the Court find, however, that records may omit such written information. Because the Court restricts its opinion to the issue of the duty to warn, and because the Court finds no warning was given whatsoever, *see* discussion *infra* Part III.C.2., the issue of the form of recordation of the giving of the warning is irrelevant.

      d.      **Conclusions Concerning the Standard of Care.**

Warnings of the risks and information about the warning signs of VTE must be given to patients facing such risks who must watch for such signs. The Court does not, however, decide

whether such warnings must be given to the patient in writing.  Nor does the Court decide

whether the giving of such warnings must be recorded in writing by the giver of the warning.

> **2.      The Defendant Breached the Standard of Care by Failing to Warn.**

The plaintiffs next bear the burden of establishing, again through expert testimony, a

deviation by the defendant from the standard of care discussed *supra* Part III.C.1.a.  *Nwaneri*,

931 A.2d at 470 (citing *Travers*, 672 A.2d at 568); *see supra* note 4.  The plaintiffs satisfy this

burden by showing that the defendant failed to warn Capt. Burton of the risks and warning signs

of DVT associated with the non-surgical treatment of his Achilles-tendon rupture, thereby,

according to expert testimony, breaching the standard of care.

The defendant concedes that no written warnings of the risks and signs of VTE were

given to Capt. Burton or his family members on any of Capt. Burton's three visits to the

WRAMC.  (*See* Trial Tr. vol. 1, 30:13–:24 (Dr. Potter: disagreeing with contention that all

warnings given must "be included in the documentation that the patient gets").)  Instead, Dr.

Potter claims that he counseled Capt. Burton orally of the risks and warnings on January 10

when discussing surgery versus non-surgical casting and on January 15 when Capt. Burton

received his first cast.  (*Id.* at 24:18–25:23, 39:21–40:15, 112:7–113:7.)  Both parties agree that

"there was no discussion of deep vein thrombosis or pulmonary embolism on the 7th of

February."  (Def.'s Reply to Pls.' Proposed Findings of Fact and Conclusions of Law 4 n.1; Pls.'

Proposed Findings of Fact and Conclusions of Law ¶ 41.)[7]  Dr. Potter cannot, however, recall

any specific details about the warnings he claims he gave; he merely points to his habit that

"every patient with a cast gets the same counseling spiel from me."  (Trial Tr. vol. 1, 58:8–:9.)

---

[7] The defendant makes the concession that no warning was given on February 7 despite
testimony from Dr. Potter that a warning was "probably" given on that day.  (*See* Trial Tr. vol. 1,
58:17–59:4.)

Mrs. Burton, on the other hand, does specifically recall the discussions between Dr. Potter and her husband.  (*See* Trial Tr. vol. 2, 218:23–219:4 (Mrs. Burton: "I knew that . . . whatever it was the doctor said that he needed or that needed to be done, that I was going to be facilitating all of this, and I listened very closely to what my new duties were going to be now."); Trial Tr. vol. 3, 20:22–21:4 (Mrs. Burton: providing detail of the discussions).)  Mrs. Burton was present with Capt. Burton during vast majority of the time during each of his three visits to the WRAMC; the only time she was away from her husband was while he was being x-rayed at his emergency-room visit on January 10.  (Trial Tr. vol. 1, 41:10–:15; Trial Tr. vol. 2, 217:5–:10; 224:18–:22.)  Mrs. Burton testified that nobody ever mentioned the risk of VTE to her or her husband at any of these visits (Trial Tr. vol. 2, 224:23–225:15) and, significantly, Dr. Potter cannot recall ever having provided warnings to Capt. Burton outside the presence of his wife (Trial Tr. vol. 1, 41:16–:18).  Mrs. Burton is a particularly credible witness; on March 5, 2003—only weeks after Capt. Burton's WRAMC visits and death, while her recollection remained fresh—Mrs. Burton wrote to the head of orthopedics at WRAMC, not out of anticipation of litigation, but to inform him that she and her husband "were never made aware of the possibility of a blood clot as a result of casting," despite Capt. Burton's having presented symptoms of DVT on February 7, and to recommend that warnings about clots be given to other patients in the future.  (Trial Tr. vol. 3, 20:9–24:1.)  In light of the consistency and clarity of Mrs. Burton's recollection in both her letter and at trial compared against the bare assertions of habit without particular recollection by Dr. Potter, the Court concludes that Mrs. Burton's testimony is accurate: No warnings about VTE were given to Capt. Burton.  The defendant therefore violated the standard of care identified by experts *supra* Part III.C.1.a.

As noted *supra* Part III.C.1.a., the defendant makes much of Dr. Potter's treatment of Capt. Burton on February 7, 2003, arguing that because Dr. Potter palpitated Capt. Burton's leg but found no tenderness, found neurovascular sensation intact, and concluded that Capt. Burton's peri-ankle swelling and nighttime swelling were not atypical, Dr. Potter concluded that Capt. Burton did not have DVT and thus did not need to be warned of it.  What Dr. Potter's actions instead show is his awareness of at least some risk of DVT faced by Capt. Burton, and that despite this awareness, Dr. Potter failed to mention the risk to Capt. Burton.  The defendant's failure to warn is therefore particularly egregious in this case.

### 3.       The Defendant's Breach Caused Injury to Capt. Burton Before Death.

The plaintiffs next bear the burden of establishing, again through expert testimony, injury to Capt. Burton before his death, such that a cause of action arose in his favor during his lifetime, and "a causal relationship between the deviation" discussed *supra* Part III.C.2. "and the injury." *Nwaneri*, 931 A.2d at 470 (quoting *Travers*, 672 A.2d at 568 (quotation marks omitted)); § 12-101; *see supra* note 4.  This requires the plaintiffs to prove what the District of Columbia collectively calls proximate causation: that (a) defendant's actions were the cause-in-fact of Capt. Burton's injury and that (b) such injury was not unforeseeable.  The plaintiffs must also (c) overcome the defendant's affirmative defenses related to causation: that Capt. Burton assumed the risk of his injury and was contributorily negligent, thus providing a superseding and intervening cause of his injury.  The plaintiffs satisfy their burden by showing that the defendant's failure to warn Capt. Burton constituted the cause-in-fact of his death, that such death was entirely foreseeable, and that Capt. Burton's failure to report to the hospital at the sign of symptoms does not show negligence or assumption of risk on his part, as he had not been warned of the dangers that those symptoms indicated.

> ### a.   The Defendant's Breach Is the Cause-in-Fact of Capt. Burton's Injury.

District of Columbia courts consider causation under the heading of "proximate cause," which "has two components: cause-in-fact and a policy element." *C & E Servs., Inc. v. Ashland, Inc.*, 498 F. Supp. 2d 242, 256 (D.D.C. 2007) (quoting *Majeska v. Dist. of Columbia*, 812 A.2d 948, 950 (D.C. 2002) (quotation marks omitted)).   The cause-in-fact component "does not require proof of causation to a certainty but rather requires that a defendant's 'conduct is a substantial factor in bringing about the harm.'"   *Id.* (quoting *Majeska*, 812 A.2d at 951 (citing RESTATEMENT (SECOND) OF TORTS § 431 (1965))).   The policy element "limits a defendant's liability when the chain of events leaving to the plaintiff's injury is unforeseeable or highly extraordinary in retrospect." *Id.* (quoting *Majeska*, 812 A.2d at 950 (quotation marks omitted)). To satisfy these components in a medical-malpractice negligence case, the plaintiffs' expert "need only state an opinion, based on a reasonable degree of medical certainty, that the defendant's negligence is more likely than anything else to have been the cause (or a cause) of [Capt. Burton's] injuries." *Travers*, 672 A.2d at 570 (quoting *Psychiatric Inst. of Wash. v. Allen*, 509 A.2d 619, 624 (D.C. 1986) (quotation marks omitted)).

Capt. Burton followed directions and was concerned about his health.   He had served and excelled in the Air Force and Coast Guard for most of the time from the early 1960s through 2000—not positions for someone who doesn't know how to follow orders.   (Trial Tr. vol. 2, 195:13–:20, 198:1–201:25.)   He kept fit and healthy by regularly playing basketball for nearly three decades and watching his diet; he never had to spend a night in the hospital in his life.   (*Id.* at 211:11–212:20.)   As he grew older and he began to have higher blood pressure, Capt. Burton again demonstrated commitment to his good health and willingness to follow doctors' orders by taking appropriate medication and monitoring his blood pressure.   (*Id.* at 213:16–:24.)   "Sam was

a military man from his heart and he recognized the chain of command, and where doctors were concerned, . . . they exceeded him in the chain of command, so whatever they said do, that's what he did," Mrs. Burton testified.  (*Id.* at 213:25–214:5.)

In this case, Mrs. Burton is convinced that that if she or her husband had known of the signs and symptoms of DVT, "Sam would have done exactly what [the doctors] said . . . [;] he did experience some symptoms, and at the onset of those symptoms, we would have been making the mad dash to get to . . . the nearest emergency room."  (*Id.* at 227:2–:11.)  The Court, too, is convinced that if Capt. Burton had known about the signs and symptoms of DVT and had been told to go to the hospital at the first sign of such symptoms, he would have.

Capt. Burton did experience symptoms of DVT on two occasions before his death.  The first episode occurred on February 9, one day after he had walked some distance through snow on crutches.  (Trial Tr. vol. 3, 21:11–:20.)  Capt. Burton experienced pain in his chest and became "absolutely winded" after walking up the seven steps in his home; he rested and "breathed a great sign of relief," saying: "That was scary."  (*Id.* at 21:20–:25.)  He and Mrs. Burton attributed these symptoms to his physical exertion on the crutches and relieved the pain with ibuprofen.  (*Id.* at 12:19–:24, 21:11–:25.)  The second episode occurred on February 20, when Capt. Burton "got on his knees and pulled a box out of a cubbyhole in the closet.  He again became winded."  (*Id.* at 22:1–:8.)  The Burtons "again related it to the fact that he had been virtually inactive for eight weeks."  (*Id.*)

These symptomatic episodes themselves constitute injury to Capt. Burton, but they are overshadowed by the injury suffered in the moments before death: As Capt. Burton suffered a massive pulmonary embolism—as clots of blood blocked arteries in both lungs, stopping his blood from circulating—he staggered, alone, two or three steps from his couch toward his front

door, searching in vain for help before collapsing, dead, on the floor of his living room.  (Trial

Tr. vol. 1, 13:4–:22; Trial Tr. vol. 2, 23:21–24:1, 25:2–:11.)  Capt. Burton's conscious pain and

suffering during his symptomatic episodes and final moments of life therefore constitute injury.

*See Capitol Hill Hosp. v. Jones*, 532 A.2d 89, 92–93 (D.C. 1987); *Doe v. Binker*, 492 A.2d 857,

861 (D.C. 1985).

Unfortunately, because Capt. Burton had not been warned that the symptoms he

experienced signified the presence of a fatal blood clot, he did not rush to the emergency room

when he experienced them.  If he had, according to expert testimony, he not only could have

avoided the injuries he suffered during life, but he would be alive today.  (Trial Tr. vol. 2, 75:21–

76:76 (Dr. Genecin: "[I]f [Capt. or Mrs. Burton] were aware that chest pain and shortness of

breath could be signs of pulmonary embolism, then they would have had the opportunity to call

and to get . . . diagnosis and treatment[] at the time when it would have, with reasonable medical

probability, been lifesaving.").)  The defendant's failure to warn, therefore, is the cause-in-fact of

Capt. Burton's pre-death injury and untimely death, satisfying the first component of proximate

causation.

### b.      Capt. Burton's Injury Was Not Unforeseeable.

Concerning the second causation component, there is nothing in this case to support the

contention that Capt. Burton's death was unforeseeable or otherwise extraordinary.  The

defendant appreciated that Capt. Burton faced some risk, however small, of VTE (Trial Tr. vol.

1, 64:5–:3, 81:22–82:4), and although Dr. Potter claims he found no signs of DVT during the

examination on February 7, he also appreciated that DVT could develop after the examination

rapidly (Trial Tr. vol. 3, 47:7–:17, 49:3–:17, 50:10–:14, 51:1–:6, 89:8–:16, 106:19–107:15,

107:21–108:3, 108:13–:23).  It is not surprising, then, that DVT developed and caused Capt.

Burton to suffer a massive PE.  Nor is it surprising that Capt. Burton did not rush to the

emergency room when he experienced warning signs of DVT, considering that he had not been

informed by the defendant that shortness of breath and chest pain were, in fact, warning signs of

a potentially deadly blood clot blocking arteries in the lungs.  *See* discussion *infra* Part III.C.3.c.

(discussing the causal importance of Capt. Burton's lack of information about warning signs).

The plaintiffs' injury, therefore, is not so unforeseeable or extraordinary as to preclude the

Court's finding that the defendant's failure to warn was the cause of Capt. Burton's death.

        c.        **Capt. Burton Did Not Assume the Risk, Commit Contributory Negligence, or Provide a Superseding or Intervening Cause of his Injury.**

       The defendant proffers three causation-related affirmative defenses in an attempt to prove

a break in the causal chain from WRAMC's failure to warn to Capt. Burton's unfortunate injury

and death.  The defendant first argues that Capt. Burton's failure to report to the hospital when

he experienced symptoms of DVT show that he assumed the risk of leaving those symptoms

untreated.  (Answer 6 ("[The p]laintiffs['] cause of action is barred because [Capt. Burton]

assumed the risk of delaying the diagnosis of DVT by choosing to not seek timely treatment in

response to medical symptoms.").)  To succeed on this defense, the defendant must show that

Capt. Burton both knew of the danger posed by leaving his symptoms untreated and voluntarily

exposed himself to that danger.  *See Morrison v. MacNamara*, 407 A.2d 555, 565 (D.C. 1979)

(citing *Dougherty v. Chas. H. Tompkins* Co., 240 F.2d 34, 35–36 (D.C. Cir. 1957)).  In other

words, Capt. Burton must have "subjectively know[n] of the existence of the risk and

appreciate[d] its unreasonable character" but nonetheless chosen to ignore it, thereby

"consciously reliev[ing] the defendant of any duty which he otherwise owed the plaintiff."  *Sinai*

*v. Polinger Co.*, 498 A.2d 520, 524 (D.C. 1985) (citing RESTATEMENT (SECOND) OF TORTS § 496D (1965)).

In medical malpractice cases, however, proving that a plaintiff had the requisite appreciation of the risk he allegedly assumed is particularly difficult:

> [T]he superior knowledge of the doctor with his expertise in medical matters and the general limited ability of the patient to ascertain the existence of certain risks and dangers that inhere in certain medical treatments, negates the critical elements of the defense, i.e., knowledge and appreciation of the risk.  Thus, save for exceptional circumstances, *a patient cannot assume the risk of negligent treatment*.

*Morrison*, 407 A.2d at 567–68 (emphasis added); *see also Hardi*, 818 A.2d at 980 (citing *Morrison*, 407 A.2d at 567–68).  In this case, there are no such exceptional circumstances to justify a finding of assumption of the risk by the patient.  As concluded *supra* Part III.C.2., the defendant failed to warn Capt. Burton of the signs and symptoms of the onset of DVT.  How, then, could he have known—much less appreciated and consciously ignored—that his chest pain and short-windedness indicated the presence of a potentially deadly blood clot?  The idea that he not only could, but did, is significantly undercut by the defendant's suggestion at trial that Capt. Burton should have recognized the warning signs as indicia of a potential heart attack and sought medical attention.  (Trial Tr. vol. 2, 152:4–:8.)  Why would Capt. Burton—if he knew the symptoms of VTE, such symptoms occurred, and he consciously ignored them for what they were—then be expected to go to the hospital for something they were not—a heart attack?  Moreover, Dr. Potter and WRAMC staff had superior knowledge and expertise in this case; they knew the risk of VTE and of the need to seek medical attention should one experience symptoms of DVT, but failed to inform Capt. Burton of that risk or need.  In short, Capt. Burton cannot have assumed a risk of which he was unaware.

The defendant second argues that Capt. Burton negligently failed to seek medical attention when he suffered symptoms of DVT, thus placing the fault of his death on himself instead of the defendant.  (Answer 6; Def.'s Proposed Findings of Fact and Conclusions of Law 28–35.)  To succeed in this defense, the defendant must prove all elements of negligence—that Capt. Burton was under a duty to report to the hospital at the sign of VTE symptoms and breached that duty by failing to do so, which caused his injury.  *See Durphy v. Kaiser Found. Health Plan of Mid-Atl. States, Inc.*, 698 A.2d 459, 465 (D.C. 1997) (citing *George Wash. Univ. v. Waas*, 648 A.2d 178, 180 (D.C. 1994)).  Because the District of Columbia is a pure contributory-negligence jurisdiction, if the defendant were to succeed in proving negligence on the part of Capt. Burton, it would be relieved of all liability in this case.  *See Elam v. Ethical Prescription Pharmacy, Inc.*, 422 A.2d 1288, 1289 n.2 (D.C. 1980) ("In this jurisdiction, the contributory negligence of the plaintiff is a complete bar to recovery.").

Concerning duty, "[c]ontributory negligence is conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection."  RESTATEMENT (SECOND) OF TORTS § 463 (1965), *quoted in Scoggins v. Jude*, 419 A.2d 999, 1004 (D.C.1980), *quoted in District of Columbia v. Mitchell*, 533 A.2d 629, 639 (D.C. 1987), *quoted in Durphy*, 698 A.2d 459, at 465.  That standard is "the degree of care a reasonable person would take for his or her *own* safety." *District of Columbia v. Brown*, 589 A.2d 384, 389 n.1 (D.C. 1991) (emphasis in original) (citing RESTATEMENT (SECOND) OF TORTS § 466 cmt. f (1965)); *Mitchell*, 533 A.2d at 639)).  As with assumption of the risk, however, a physician's superior knowledge and expertise makes contributory negligence a difficult defense to prove in medical-malpractice cases: "[B]ecause of the doctor's ability to understand and interpret medical matters, the doctor

generally owes a greater duty to his patient than the patient owes to himself." *Morrison*, 407

A.2d at 567, 567 n.11, *cited in Durphy*, 698 A.2d at 465.

In this case, the defendant, through its experts, claims that Capt. Burton was under a duty

to seek immediate medical care when he experienced chest pains and shortness of breath,

regardless of whether he had been warned that or recognized that these were symptoms of VTE.

(Trial Tr. vol. 3, 110:1–:14.)  District of Columbia caselaw on point is sparse but illuminating.

In *Durphy*, a plaintiff whose foot was amputated as a result of negligence by his HMO in failing

to timely diagnose and treat his ailment was found contributorily negligent when he refused to

attend appointments with his physician or wear a cast as directed by his physician. 968 A.2d at

466.  In *Denis v. Jones*, a jury rejected the defense of contributory negligence, even where a

doctor insisted that he informed his patient of the risks of smoking but the patient continued

smoking, underwent surgery, and suffered from post-surgical complications to which, according

to expert witnesses, the smoking contributed.  982 A.2d 672, 677–79 (D.C. 2007).  In *Hall v.

Carter*, a plaintiff who suffered complications after hernia surgery was found contributorily

negligent when she failed to disclose to her physician the extent of her smoking habit and

continued to smoke despite being instructed not to by her physician.  825 A.2d 954 (D.C. 2003).

And in *Stager v. Schneider*, the court found although a patient has a duty to cooperate in

communication with his physician, a patient was not contributorily negligent in failing to call

and inquire as to medical-test results.  94 A.2d 1307 (D.C. 1985).

As these cases show, in the District of Columbia, patients are under a duty to themselves

to follow their doctors' instructions and provide information requested by their doctors to

facilitate their health care.  However, particularly considering physicians' superior knowledge

and expertise, D.C. caselaw does not place patients under a duty to recognize the urgency of

symptoms of which they have not been informed.  Nor does D.C. caselaw place patients under a duty to recognize the urgency of symptoms that they could easily mistake as passing and insignificant.  In light of the defendant's failure to warn Capt. Burton of the signs and symptoms of VTE, *see* discussion *supra* Part III.C.2., and the reasonable attribution by Capt Burton of his chest pain and short-windedness to physical exertion after prolonged rest (Trial Tr. vol. 3, 21:11–22:8), the Court concludes that Capt. Burton was not under a duty to rush to the hospital upon his experiencing chest pain and difficulty breathing.  His failure to do so, then, does not constitute a breach of any duty.  Capt. Burton, therefore, did not commit contributory negligence.

The defendant finally argues that Capt. Burton's failure to report to the hospital constitutes a superseding and intervening cause of his injury, thereby absolving the defendant of responsibility.  (*See* Answer 6.)  "Proximate cause has been defined as that cause which, in natural and continual sequence, *unbroken by any efficient intervening cause*, produces the injury . . . ."  *McKethean v. WMATA*, 588 A.2d 708, 716 (D.C. 1991) (emphasis added) (citations and quotation marks omitted).  In the District of Columbia, an intervening cause is the same thing as a superseding cause.  *Id.* at 716 n.9 (citing RESTATEMENT (SECOND) OF TORTS § 440 (1965)).  Specifically, the defendant claims that it "is not liable for [the p]laintiffs' injuries to the extent that another actor or actors' negligence were intervening or new or superseding causes of the alleged injuries."  (Answer 6.)  That is correct.  Unfortunately for the defendant, as discussed above in this Part, Capt. Burton did *not* act negligently when he did not report to the hospital.  Because, neither Capt. Burton nor any other actor interveningly or supersedingly caused injury to Capt. Burton, the defense of intervening and superseding cause fails.

       **d.**      **Conclusions Concerning Causation.**

The defendant's failure to warn was the cause-in-fact of Capt. Burton's injury, which was entirely foreseeable.  Capt. Burton did not assume the risk of his injury by failing to seek medical attention when suffering symptoms of VTE, nor did such failure constitute contributory negligence.  Finally, no third-party actor constituted an intervening or superseding cause of Capt. Burton's injury.  Therefore, the defendant caused Capt. Burton's pre-death injury.

      **4.**      **Capt. Burton's Death Caused Injury to the Plaintiffs.**

In addition to suffering injury during his lifetime as a result of the defendant's negligence, Capt. Burton died.  (Trial Tr. vol. 3, 17:11–:12.)  Just as the defendant's failure to warn caused Capt. Burton's injuries during his lifetime, the defendant's failure to warn also caused his death.  (Trial Tr. vol. 2, 75:21–76:76 (Dr. Genecin: "[I]f [Capt. or Mrs. Burton] were aware that chest pain and shortness of breath could be signs of pulmonary embolism, then they would have had the opportunity to call and to get . . . diagnosis and treatment[] at the time when it would have, with reasonable medical probability, been *lifesaving*." (emphasis added))); *see* discussion *supra* Part III.C.3.

As a result of Capt. Burton's death, Mrs. Burton has suffered tremendously, both financially and familially.  As the Burton's son, Derrick Burton, testified: "My mom has lost a lot. . . . [M]y dad has been my mom's best friend.  He has been the one that she leaned on, the one that she turned to. . . . [T]he loss of that companionship is tremendous. . . . [S]he has also lost . . . his support."  (Trial Tr. vol. 1, 17:2–:8.)  Specifically, Mrs. Burton has lost financial support from Capt. Burton's pension and Social Security payments, has lost household services provided by Capt. Burton, has incurred significant funeral expenses, and has lost consortium with her husband.  *See* discussion *infra* Part IV.C.  The causal link between Capt. Burton's death

and these losses and expenses is clear—Capt. Burton's death was the substantial factor leading to these foreseeable losses and expenses—satisfying the causal standards discussed *supra* Part III.C.3.  The defendant (assuming arguendo its liability) does not challenge causation; the parties merely disagree on the amount of the injury.  (*See* Pls.' Proposed Findings of Fact and Conclusions of Law ¶¶ 107–22; Def.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 121–41; Pls.' Reply to Def.'s Proposed Findings of Fact and Conclusions of Law 8–9.)  The Court considers this disagreement in Part IV. below.

     **5.**      **Conclusions Concerning Liability.**

     The standard of care requires that warnings of the risks and information about the warning signs of VTE be given to patients facing such risks who must watch for such signs.  No warnings about VTE were given to Capt. Burton.  The defendant's failure to warn was the cause-in-fact of Capt. Burton's injury, which was entirely foreseeable; Capt. Burton did not assume the risk of his injury by failing to seek medical attention when suffering symptoms of VTE, nor did such failure constitute contributory negligence; and no third-party actor constituted an intervening or superseding cause of Capt. Burton's injury.  Therefore, the defendant is liable for Capt. Burton's pre-death injury under the Survivor Act.

     Just as the defendant's failure to warn caused Capt. Burton's injuries during his lifetime, the defendant's failure to warn also caused his death.  As a result of Capt. Burton's death, Mrs. Burton has suffered economic and non-economic injury.  Therefore, the defendant is liable under the Wrongful Death Act.

## IV.    DAMAGES.

**A.    Damages Are Available Under Both the Survival Act and the Wrongful Death Act.**

In the District of Columbia, "if a tort causes death, two interests have been invaded. The first is the interest of the deceased in the security of his person and property. . . . The second is the impairment of the interest of the deceased's spouse and next of kin." *Runyon v. District of Columbia*, 463 F.2d 1319, 1321 (D.C. Cir. 1972); *see* §§ 12-101, 16-2701.  Under the Survival Act, recovery by the decedent's estate "is comprised of that which the deceased would have been able to recover had he lived"—in this case, damages for the decedent's pain and suffering. *Graves v. United States*, 517 F. Supp. 95, 99 (D.D.C. 1981) (citing *Semler v. Psych. Inst. of Wash., D.C., Inc.*, 575 F.2d 922, 925 (D.C. Cir. 1978)).  Under the Wrongful Death Act, however, recovery by the decedent's survivors is comprised of economic damages to the decedent's spouse—in this case, compensating the lack of pension and Social Security payments, the lack household services rendered, and funeral expenses—and non-economic damages to the decedent's spouse—in this case, compensating loss of consortium.  § 16-2701; *see Jefferson v. E.D. Etnyre & Co.*, 300 F. Supp. 2d 109, 112 (D.D.C. 2004); *Runyon*, 463 F.2d at 1322. Pursuant to its Pretrial Order of March 6, 2009, the Court will apply District of Columbia law in this case with respect to all damage calculations except compensation for loss of consortium with Capt. Burton, which will be calculated under Maryland law.

The remedies provided by the Survival Act and Wrongful Death Act "are not mutually exclusive and may be pursued simultaneously." *Strother v. District of Columbia*, 372 A.2d 1291, 1295 (D.C. 1997).  However, "double recovery for same elements of should of course be avoided." *Waldon v. Covington*, 415 A.2d 1070, 1075 n.17 (D.C. 1980) (quoting *Runyon*, 463

F.2d at 1321 (quotation marks omitted))); *see also Strother*, 372 A.2d at 1295 n.5.  With these

considerations in mind, the Court now turns to calculation of damages.

**B.      Capt. Burton's Estate Is Awarded Damages Under the Survival Act.**

Capt. Burton's estate is entitled to recovery for Capt. Burton's conscious pain and

suffering.  The award must compensate for his bodily injury, mental anguish, and discomfort he

experienced until his death.  *See Graves*, 517 F. Supp. at 99; *Binker*, 492 A.2d at 860–861 (D.C.

1985); *Capitol Hill Hosp.*, 532 A.2d at 92–93.  "[T]he existence of pain and suffering [can] be

inferred from the circumstances surrounding the decedent's death."  *Capitol Hill Hosp.*, 532

A.2d at 92 (citing *Binker*, 492 A.2d at 861).

The evidence discussed above shows that before the final episode on the day of Capt.

Burton's death, he suffered two episodes of significant and frightening chest pain and short-

windedness, enough for him to remark: "That was scary."  The evidence further shows that on

the final day of his life, Capt. Burton suffered greatly:  He was conscious when his blood stopped

circulating as arteries in his lungs were clogged with coagulation.  He undoubtedly suffered

tremendous pain as he staggered forward in search of aid that he could never reach.  He

ultimately collapsed onto his living room floor to die, probably not understanding what was

happening to him, and without the comfort of family members by his side in his final moments

of life.  Considering these facts, the Court finds that $200,000 is fair and reasonable

compensation for Capt. Burton's pain and suffering.

**C.      Mrs. Burton Is Awarded Damages Under the Wrongful Death Act.**

**1.      Mrs. Burton Is Entitled to Recovery of Economic Damages.**

First and foremost, economic damages include "the future contributions toward the

maintenance of the spouse and next of kin that the deceased probably would have made had the

act which forms the basis of the actions not occurred." *Runyon*, 463 F.2d at 1322.  Recovery of

these lost future contributions "compensates for pecuniary loss[, ]calculated as the annual share

of decedent's dependents in the decedent's earnings, multiplied by the decedent's work life

expectancy, and discounted to present value." *Binker*, 492 A.2d at 863.

Richard Lurito, Ph.D., the plaintiffs' economic expert, testified as to the value of this

pecuniary loss and how he calculated that value; the plaintiffs entered his report into evidence.

(*See* Trial Tr. vol. 2, 166–178.)  At the time of his death, Capt. Burton had two sources of

income: military pension retirement pay and Social Security benefits.  (*Id.* at 166:9–:11.)

Concerning the first source, according to Capt. Burton's 2002 federal income-tax return, he

received $66,531.00 in pension payments in the tax year before his death.  (*Id.* at 166:13–:15.)

Pension benefits are not stagnant; they increase annually per cost-of-living adjustments based on

the federal government's inflation predictions.  (*Id.* at 166:20–:25.)  The Court adopts Dr.

Lurito's 3% inflation estimate, which is based on the 2007 inflation prediction report of the

Social Security Administration.  (*See id.* at 166:23–167:23.)  Capt. Burton was aged about 62

years and one month when he died in 2003.  (Trial Tr. vol. 2, 166:3–:5.)  According to life-

expectancy tables published by the U.S. Department of Health and Human Services, had Capt.

Burton not died of a massive pulmonary embolism, he probably would have lived another 16.9

years—the life expectancy of a typical black male of Capt. Burton's age.  (*Id.* at 166:5–:8.)

Finally, the Court adopts Dr. Lurito's 4% discount rate for determining present value.  (*See id.* at

168:4–:7.)  That number, which is an estimate of a rate of return on a 16.9-year investment of a

lump sum of the decedent's pension payments, serves to minimize economic loss to Mrs. Burton

caused by the reduction of future lifetime earnings to present value.  (*Id.* at 168:7–169:13.)  The

pre-tax present value of Capt. Burton's lifetime pension payments is therefore $1,356,006.00. (*Id.* at 169:16–:17.)

Concerning his second source income, Capt. Burton received $1319.00 per month in Social Security benefits at the time of his death.  (Trial Tr. vol. 2, 170:20–171:6.)  As with pension payments, Social Security benefits are not stagnant; they also increase with inflation, and the Court again adopts Dr. Lurito's 3% inflation estimate.  (*Id.* at 171:8–:13.)  Again considering a life expectancy of 16.9 years and a discount rate of 4%, the pre-tax present value of Capt. Burton's lifetime Social Security benefits is therefore $314,064.00.  (*Id.* at 171:14.)

The total pre-tax present value of lost pension payments and Social Security benefits is $1,670,070.00.  (Trial Tr. vol. 2, 171:19–:21.)  From this number, federal and state income taxes that would have been paid by Capt. Burton must be deducted.  (*Id.* at 172:8–:11.)  Capt. Burton, a Maryland resident before his death, faced a 20.1% combined federal and Maryland income-tax rate.  (*Id.* at 172:21–:23.)  The Court adopts Dr. Lurito's assumption that the Burtons would take the standard deduction—about $10,900 for the family—which is a conservative estimate, considering that the Burtons' tax returns show that the family has been taking about $30,000 in deductions annually, and one personal exemption each for Capt. and Mrs. Burton.  (*See id.* at 172:14–:23.)  Considering these assumptions, the Court must therefore deduct $335,694.00 to account for income taxes.  (*Id.* at 173:3–:5.)

In addition to taxes, amounts that Capt. Burton would have spent on his own personal maintenance must be deducted from total pre-tax present value of lost pension payments and Social Security benefits.  (*Id.* at 173:7–:8.)  Personal maintenance includes such things as personal food, clothing, entertainment, and transportation, but does not include expenses such as those related to housing where the house continues to be occupied by—and expenses continue to

be made by—a surviving spouse.  (*Id.* at 173:7–175:1.)  The Court adopts Dr. Lurito's 13.5%

deduction rate for personal-maintenance expenditures, which is based on U.S. Department of

Labor data concerning consumer expenditures by members of a typical family of the Burtons'

size and income level.  (*See id.* at 173:19–:23, 174:16–:18.)  Considering these assumptions, the

Court must therefore deduct $225,626.00 to account for personal maintenance expenses.  (*Id.* at

175:21–:22.)

     The final present value of Capt. Burton's income sources—lost income of $1,670,070.00

less taxes of $335,694.00 and personal expenses of $225,626.00—is $1,108,750.00.  (*See id.* at

175:22–176:1.)  Up to this point, the defendant does not dispute the plaintiffs' numbers (*see*

Def.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 121–30), but the defendant rightly

points the Court to a flaw in the adoption of the final present value as the amount of the damage

award: Because it includes the present value of amounts lost from Capt. Burton's death until

judgment was rendered, this number effectively includes prejudgment interest in the proposed

damage award, and prejudgment interest may not be so included.  *See* 28 U.S.C. § 2674 (2006)

("The United States . . . shall not be liable for interest prior to judgment . . . .); (Trial Tr. vol. 2,

185:12–186:16; Def.'s Proposed Findings of Fact and Conclusions of Law ¶ 131).  The plaintiffs

argue that although "a calculation that inflates the dollars awarded for the loss of money between

the time of injury and trial is similar in result to a prejudgment interest calculation, it is

permissible because it complies with the present[-]value rule."  (Pls.' Reply to Def.'s Proposed

Findings of Fact and Conclusions of Law 9.)  The inflation to present value of damages

attributed to the time between injury and damage award is necessary, plaintiffs say, to ensure that

the plaintiffs receive "the amount that the injured party would have earned but for the injury."

(*Id.* (quoting *District of Columbia v. Barriteau*, 399 A.2d 563, 567 n.6 (D.C. 1979) (quotation marks omitted)).)

Although the Court is not aware of any cases brought under the FTCA on point, several federal courts have considered the distinction between prejudgment interest and present-value calculations in other contexts. *See, e.g.*, *In re Oil Spill by the Amoco Cadiz off the Coast of Fr. on Mar. 16, 1978*, 954 F.2d 1279, 1332 (7th Cir. 1992); *In re Air Crash Disaster Near Chi., Ill., on May 25, 1979*, 644 F.2d 633 (7th Cir. 1981); *Moore-McCormack Lines, Inc. v. Richardson*, 295 F.2d 583 (2d Cir. 1961). The award of prejudgment interest for losses suffered between the accrual of a cause of action and the rendering of a judgment "is just the flip side of discounting to present value in a tort case for future loss" suffered after judgment is rendered. *In re Oil Spill*, 954 F.2d 1279, 1332. Thus, although the two concepts of prejudgment interest and present value are related, they should be distinguished. The FTCA is clear in its prohibition on the award of prejudgment interest against the United States, § 2674, and considering that it "is a comprehensive statute" designed to establish the parameters of the United States' waiver of sovereign immunity, *McNamara v. United States*, 199 F. Supp. 879, 880 (D.D.C. 1961), the Court must respect the Act's limitation on the waiver of immunity as to prejudgment interest. The amount of such interest included in Dr. Lurito's calculations totals $75,558.00. (Def.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 132–37.) Deducting this additional amount, the Court awards $1,033,192.00 for lost income. (*See id.* ¶ 137.)

In addition to lost income, economic damages include the value of household services that would have been provided by Capt. Burton had he not died. Capt. Burton preformed ordinary household repair and maintenance, did outdoor work, washed the dishes, helped with the laundry, and the like. The Court adopts Dr. Lurito's estimated value of the loss of such

services—$13 per hour—a very conservative estimate.  (Trial Tr. vol. 2, 176:2–177:4.)

Assuming that 20 hours of services would be rendered per week for 50 weeks per year, and again

assuming a 4% discount rate and 16.9-year life expectancy, the loss of household services totals

$219,700.00.  (*Id.* at 177:2–:4.)  The defendant does not dispute this figure.  (*See* Def.'s

Proposed Findings of Fact and Conclusions of Law ¶¶ 139–40.)

The final component of Mrs. Burton's economic damages is funeral expenses.  These

expenses totaled $8,083.00.  (Pls.' Proposed Findings of Fact and Conclusions of Law ¶ 119.C.)

The total of Mrs. Burton's economic damages—$1,033,192.00 for lost income,

$219,700.00 for lost household services, and $8,083.00 for funeral expenses—is $1,260,975.00.

**2.      Mrs. Burton Is Entitled to Recovery of Non-Economic Damages.**

In addition to economic damages, Mrs. Burton is entitled to recovery for loss of

consortium with her husband.  Under Maryland law, such recovery "may include damages for

mental anguish[;] emotional pain and suffering[; and] loss of society, companionship, comfort,

protection, marital care, . . . attention, advice, [or] counsel . . . ."  MD. CODE ANN., CTS. & JUD.

PROC. § 3-904(d) (West 2002).  Maryland law, however, places a ceiling on such damages; for

causes of action arising between October 1, 2002 and September 30, 2003, they may not exceed

$620,000.00.  *Id.* § 11-108(b)(2).

As the Burtons' son, Derrick Burton, testified: "My mom has lost a lot. . . . [M]y dad has

been my mom's best friend.  He has been the one that she leaned on, the one that she turned

to. . . . [T]he loss of that companionship is tremendous."  (Trial Tr. vol. 1, 17:2–:7.)  Considering

Mrs. Burton's great personal loss, the Court finds that the $620,000.00 maximum is fair and

reasonable compensation for Mrs. Burton's loss of consortium.

**D.      Conclusions Concerning Damages.**

Capt. Burton's estate is awarded $200,000.00 for Capt. Burton's pain and suffering.  Mrs.

Burton is awarded $1,260,975.00 in economic damages for lost income, lost household services,

and funeral expenses.  Mrs. Burton is further awarded $620,000.00 for her loss of consortium.

The total damage awarded is therefore 2,080,975.00.

<h2 style="text-align:center">V.      CONCLUSION.</h2>

For the reasons set forth above, judgment has been entered in favor of the plaintiffs

against the defendant in the amount of $2,080,975.00.  This Memorandum Opinion shall

constitute the Court's finding of fact and conclusions of law.

So Ordered this 9th day of November, 2009.

/s/_____
Royce C. Lamberth
Chief Judge
United States District Court